### ROSEN v. LOEW'S, Inc.

#### No. 263, Docket 20584.

Circuit Court of Appeals, Second Circuit.

July 23, 1947.

786

Saul E. Rogers, of New York City (Sol Ringel and Milford Fenster, both of New York City, of counsel), for appellant.

Samuel D. Cohen and J. Robert Rubin, both of New York City, for appellee.

Before L. HAND, CHASE and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

The plaintiff sues for the infringement of his copyright of a moving picture scenario, taken out as a "dramatic composition" —"The Mad Dog of Europe"—under § 11 of the Copyright Act.[1] Two questions arise: first, whether he abandoned the copyright; and, second, whether the defendant infringed it. The judge found against him upon both issues; but, as we agree with him upon the second, we shall not pass upon the first. The facts were as follows. A woman, named Root, wrote the scenario and dialogue for a moving picture play entitled, "The Mad Dog of Europe"; the theme being suggested to her by a man, named Mankiewicz. The picture was to show the rise of Hitler to power, and the devastation caused to a Jewish family through the spread of anti-Semitism. Root and Mankiewicz sold the play to the plaintiff on December 18, 1933, and on the 26th he deposited one copy in the Copyright Office and copyrighted it as a "dramatic composition," under § 11 of the Act, as a "work(s) not reproduced for sale." The plot turns upon the effect of anti-Semitism upon a love affair between a daughter of the Jewish family, Ilsa, and the son of a Gentile German family both living in the town of Gronau. The Jews— the Mendelsohns—have three sons and a daughter; they have been life-long friends of the Germans—who have two sons— Heinrich and Fritz. The children have been brought up together; and Heinrich is engaged to marry Ilsa. Later Heinrich becomes an ardent and prominent Nazi, and breaks his engagement to Ilsa, who then falls in love with Fritz and marries him. Fritz refuses to become a Nazi, and the Mendelsohns, including Ilsa and Fritz, are persecuted and threatened with imprisonment. Mendelsohn, the father, and one of the sons are killed by the Nazis, and Fritz and Ilsa realize that they must escape, or they will be taken prisoner. This they decide to do by walking across the border at night. Heinrich knows their plan; that the Nazis have got wind of it; and that they mean to send a patrol to arrest them. Heinrich, who has meanwhile become disgusted by the murders and other atrocities of the Nazis, warns Fritz and Ilsa before the Nazi patrol arrives, gives them his motor car, and delays the patrol long enough for them to make off, but only by himself standing in the path of shots, which the patrol fires at the escaping couple, and which kill him.

The defendant is the owner of a play, called "The Mortal Storm," which is produced as a motion picture in 1939, and which it founded upon a book of the same name, published by Phyllis Bottome, in 1938. The theme of both the book and the play also deals with a love affair between a Jewess and a Gentile in Germany; and the plot is in outline as follows. A Jewish family, named Roth, in a Bavarian town near the border, consists of the parents, three sons and a daughter, Freya. The father is an instructor in a university, and is a life-long friend of a German aristocrat named Marberg, who has, so far as appears, only one son, Fritz. Fritz and Freya are in love and become engaged at a birthday party, given for Roth. Fritz later becomes an ardent Nazi, and Freya breaks off the engagement and thereafter falls in love with another Gentile, Martin Breitner, whom she has known since childhood; for the Roths and the Breitners have been friends, like the Roths and the Marbergs. Martin is a young man of somewhat radical leanings; and, after Hitler comes to power, the Nazis persecute the Roths, Martin and Freya. They send Roth to a con-

---

[1] § 11, Title 17, U.S.C.A.

centration camp, where he dies, although just before he does, Freya succeeds in persuading Fritz to let her mother see him. Martin has helped a suspect to cross the border but has come back to his mother's home; and he and Freya plan to escape and get married in Austria. The Gestapo has learned of this and sends a patrol to intercept them, putting Fritz in command. He asks to be excused, but after he is told that he must obey, there is absolutely nothing to indicate that he in any way delays or impedes the pursuit; indeed, it is he that gives the order to fire the bullets that kill Freya and wound Martin, just after the couple have crossed the border.

The Bottome book differs in a number of details from the defendant's play. Martin, sub nomine Hans, is a Communist, and has been forced to leave Germany after the Reichstag fire. After Freya breaks with Fritz, she and Hans become lovers and she becomes pregnant. The couple do not try to escape together; Hans tries alone. Fritz remains a confirmed Nazi, and is still in love with Freya. He personally shoots Hans after the two men under his command have missed.

The defendant took the depositions of three of the four persons who composed its play: Froeschel, Rameau and Franklin. The substance of Froeschel's testimony was this. He was an Austrian, a university graduate, who had been an officer in the Austrian Army during the first war, "an assistant judge in Vienna up to 1922," and always something of a novelist and writer. He entered the employ of the defendant in 1939, before which he had been employed by others in writing scenarios. He began on the play on April 20, 1939, and finished about a year later, making the Bottome book the basis, with a number of changes which his experience as a film writer told him were necessary. For example, the censor would not have allowed Freya to be pregnant of an illegitimate child; nor would it do to have the hero a Communist. He had worked with Franklin and Rameau, and a woman, named West, who died in April, 1943; and it was impossible for him to tell how much each severally contributed to the play. He

never saw a copy of plaintiff's play; was never told of its story; never saw an outline or synopsis of it; and never copied any of the scenes, situations, details or dialogue. Rameau's deposition was as follows. He was also a German; he came to the United States in December, 1937, he had been an actor and he had written for the screen since he was fifteen. He entered the defendant's service on April 20, 1939 and had been with it ever since; and he was one of the writers of the defendant's play; just as he had helped on a number of others. Froeschel, Franklin, West and he based the play upon the Bottome book; all collaborated, though Franklin, as prospective producer, was in charge. He had never seen a copy of the plaintiff's play, had never been told the story; he did not copy it in outline or in any of its details. Franklin testified that he had entered the employ of the defendant's predecessor in April, 1932, had worked for the defendant from that time forward, and had been the producer of many motion pictures, having been in the business since 1915. The defendant bought the rights of the Bottome book on April 12, 1939, and it was the source of the defendant's play in suit, of which Franklin was the producer. He had read the book several times while working up the play; it had to be much condensed and modified in a number of details; such as the illegitimate child and the Communism of the hero. While it was being written he had conferences with West, Froeschel and Rameau over a number of months. He had found Froeschel and Rameau particularly suitable for the job because they were Germans and had only recently left the country. So far as he could recall, he had never seen the plaintiff's play and had never been told its story or the outline of the story. In any case he did not use it in any particular whatever in the production of the play.

The plaintiff testified that in 1933 he gave a copy of his scenario to an "executive producer" of the defendant's predecessor, named Rapf; and another to a "scenario editor," named Mark. Each said that the subject was at that time too inflammatory to be made into a play, because

it would injure the German moving picture business. In November of 1933 he received a telegram from Mayer, then the president of the defendant's predecessor, and an interview followed. Mayer mentioned the scenario; but said that no picture would be made "because we have interests in Germany; I represent the picture industry here in Hollywood; we have exchanges there; we have terrific income in Germany and, as far as I am concerned, this picture will never be made." He also testified that in the early part of 1939 one, Nebenzahl, a "producer" of the defendant's, told him that it might be then time to make the picture, and Nebenzahl took a copy with him to Hollywood. Some months later Nebenzahl told him that there was nothing he could do, and gave him back the copy. On this testimony the judge found that although the defendant had had access to the scenario before it produced the play, neither it "nor anyone connected with the motion picture production of 'The Mortal Storm' copied or appropriated any part of the complainant's script, 'The Mad Dog of Europe.'" He also found that, even if "appropriation were * * * assumed," it would not constitute an infringement. For these reasons he dismissed the complaint.

■■■ If the finding is not "clearly erroneous" that the defendant copied nothing from the scenario, the appeal ends. In order to hold that it is, we must conclude that Froeschel, Rameau and Franklin all deliberately perjured themselves; and that we can do only in case those points—if any—in which the play is more like the scenario than the book, are inherently so convincing that no other conclusion is reasonably possible than that as to these at any rate the composers did resort to the scenario, whatever they may have said. We should have no justification for so doing. The explanation for some of the play's departures from the book are manifestly reasonable and it would be absurd to doubt them: e.g., the elimination of Hans Breitner's Communism and Freya's pregnancy. Again, the substitution of Freya for Hans as the eventual victim of the Nazis was a natural device: the woman being a more sentimentally appealing offering than the man to immature tastes. As we have said, there is not the slightest evidence that Fritz, like Heinrich in the scenario, tried to protect the couple. It was natural—whether or not it was commendable—for the defendant, because of its German business, not to wish to use the scenario in 1933; although it is of course conceivable that, later and in 1939 it might have turned to it and made use of the copies which we are to assume that it had in its library. Sheldon v. Metro-Goldwyn Pictures Corp.[2] was indeed such a case; but the evidence of plagiarism which overcame the denials was immensely stronger. In the first place the defendant had made an offer for the play which had had a substantial success as the role of a popular actress. Moreover, although the play was built upon a historical event and the film in part upon a novel, based on the same event, in those respects on which we particularly relied, the film "tracked" the play with a completeness, wholly absent from the case at bar. In details of treatment as well as in outline of plot the defendant's play at bar follows the Bottome book; and follows the scenario only so far as the book follows it. There are variations, it is true, as we have said; it would be absurd to expect that there should not be; but they do no more than adapt the play for the screen. The details on which the plaintiff relies as copied, were nearly inevitable; certainly to be expected in a dramatic composition dealing with the place and period. The burning of the Jewish books was known all over the world; it was natural to select it for the play in the United States. The scholars who rioted because their teacher was a Jew readily suggested itself to any one; and the manner of its treatment was totally different in the scenario and the play. It is not necessary to go through the various items of supposed similarity; they are utterly insufficient.

In copyright we have become accustomed to actions without shadow of merit. Apparently the conviction of which authors

---

[2] 2 Cir., 81 F.2d 49.

and composers cannot be disabused, extends to their assignees; that the finest gossamers of similarity can be made to serve. The prizes are large; the security of the foundation often seems to be in inverse proportion.

Judgment affirmed.