Ray BRADBURY, Plaintiff,

v.

COLUMBIA BROADCASTING SYSTEM, Inc., a corporation; Martin Manulis; Robert Alan Aurthur; et al., Defendants.

No. 471-58-Y.

United States District Court
S. D. California,
Central Division.

June 15, 1959.

Carter & Marks, by Gerson Marks, Sanford I. Carter, Beverly Hills, Cal., for plaintiff.

Lillick, Geary, McHose, Roethke & Myers, by William A. C. Roethke, Anthony Liebig, Los Angeles, Cal., for defendants.

YANKWICH, District Judge.

In this action the plaintiff Ray Bradbury, to be referred to as "Bradbury", seeks to recover damages, general and exemplary, with accounting of profits and attorneys fees from Columbia Broadcasting System, to be referred to as "Columbia", Martin Manulis, producer, to be referred to as "Manulis", and Robert Alan Aurthur, to be referred to as "Aurthur", for alleged infringement of copyright. 17 U.S.C.A. § 13. Injunctive relief and destruction of a film play is also sought.

Bradbury is a well-known writer in the field known as "Science Fiction". A Los Angeles columnist has called him "one of the nation's most prolific authors of realistic fantasy". (Matt Weinstock, Mirror-News, June 8, 1959, Page 1, Part II) Aurthur has been a writer-producer of television dramas and, more recently, of motion pictures. Columbia produces and distributes radio and television programs. Manulis was the producer of a television play entitled "A Sound of Different Drummers" which was telecast on October 3, 1957, on the program known as "Playhouse 90".

It is Bradbury's claim that the play lifted, in whole or part, materials from two of his books duly copyrighted, "The Fireman" published in "Galaxy", a Science Fiction magazine, in February, 1951, and later expanded into a copyrighted book called "Fahrenheit 451", published in 1953. In both instances, the Copyright Act was fully complied with (17 U.S.C.A. §§ 1–22) and the copyrights are now owned by Bradbury.

We state at the outset that the attorneys for the defendant agree with the court and concede that the material *was copyrightable and fulfilled the legal requirements of originality*. The problems to resolve are access and infringement.

# I

## Access

Access "alone means nothing". Dellar v. Samuel Goldwyn, 2 Cir., 1939, 104 F.2d 661, 662. However, where direct access is shown, the probability of copying is high. Nikanov v. Simon & Schuster, Inc., 2 Cir., 1957, 246 F.2d 501, 504. On this topic, it is well to quote from Shipman v. R. K. O. Radio Pictures, Inc., 2 Cir., 1938, 100 F.2d 533, 537, because the court there distinguished

its own prior case, Sheldon v. Metro-Goldwyn Pictures Corp., 2 Cir., 1936, 81 F.2d 49, on which so much reliance was placed by plaintiff in the case before us. To quote from the Shipman case:

"This court attempted to provide a workable test in Nichols v. Universal Pictures Corp., 2 Cir., 45 F.2d 119, where after asserting 'the decisions cannot help much in a new case' ([45 F.2d at] page 121), it was suggested that we must view the problem as one of 'abstractions'. We said,

" 'Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about * * *; *but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his "ideas," to which, apart from their expression, his property is never extended.* (Cit.) Nobody has even been able to fix that boundary, and nobody can * * *. As respects plays, the controversy chiefly centers upon the characters and sequence of incident, these being the substance.'

*"But use of the device of 'abstractions' seems but a new name for comparing 'similarity of sequences of incident'.* It is naturally difficult to compare literary works by using the terminology of metaphysics, and the rule thus provided does not seem to have been used since its suggestion. See Sheldon v. Metro-Goldwyn Pictures Corp., 2 Cir., 81 F.2d 49. In the Sheldon Case, this court propounded two questions: (1) did defendants actually use plaintiff's play, and (2) if so, was there a fair use. Fair use is defined as copying the theme or ideas rather than their expression. * * *

"As a result of these decisions, *if there is access, the probability that the similarities are the result of copying, intentional or unintentional, is so high that there is only one pertinent question: are there similarities of matters which justify the infringement claimed? Was there a piracy of copyrightable play as shown by similarities of locale, characters, and incidents?* We hold the answer should be in the negative." 100 F.2d at page 537. (Emphasis added.)

This pronouncement is extremely important, because, as will appear later on in the discussion, in the case before us the literary critic, Robert R. Kirsch, conceded that there was no imitation of *Bradbury's dialogue or wording* in any scene of the play. And Bradbury's claim that the reference to "the compact majority" was taken from his books, if not a "trivial" taking, lost all meaning when it was disclosed (even in the play) that it came from one of Henrik Ibsen's plays, where it read in full:

"The most dangerous enemy to truth and freedom among us is the compact majority." (Ibsen, An Enemy of the People, Act IV, as quoted in Bartlett's Familiar Quotations, 13th and Centennial Ed., 1955, pp. 641(b)–642(a))

The statement of doctrine from the Shipman case is also helpful because it condemns "abstraction"[1] as a means of identity, a phrase which Bradbury changed into "aura" and his expert changed into "impression" or other terms equally nebulous,—a test that might ap-

---

[1]. Courts of Appeals, including our own, have consistently condemned "abstraction" as a means of establishing similarity. See, Kustoff v. Chaplin, 9 Cir., 1941, 120 F.2d 551, 561; Twentieth Century-Fox Film Corp. v. Stonesifer, 9 Cir., 1944, 140 F.2d 579, 582. And see, Funkhouser v. Loew's, Inc., 8 Cir., 1953, 208 F.2d 185, 188.

ply, if at all, to sculpture, music or painting. As to *mood* in music, reference is made to what is said in the writer's article "Legal Protection of Ideas", 1957, 43 Va.Law Rev. 375, especially the Subdivision entitled "Protection of Originality in Music", pp. 368–390.

As to *mood* in painting, there is a case involving a painting in which an English Judge remarked:

"It was not only the dog which was taken, but also the feeling and artistic character of the plaintiff's work." (Brooks v. Religious Tract Society, 1895, 45 W.R. 476, as quoted in Copinger and Skone James on Copyright, 9th Ed., 1958, p. 179)

But the same criterion *would not* apply to a book or a play.

What evidence is there of access? In my view, none. Aurthur has denied emphatically that he ever read the book before this litigation began. This is not contradicted by anyone. There is in evidence an option by Columbia to buy Bradbury's short story, "The Fireman", dated March 4, 1952. It is also of record that in 1955 Bernard Wolfe, who was to write the story, discussed with Aurthur some of the technical problems involved, such as the "mechanical hound". The memorandum which Wolfe wrote will be discussed further on in the opinion.

But there is no credible evidence that Aurthur was told the details of the story. In truth, he was, at the time, engaged in doing for television "Darkness at Noon" which deals with the eternal problem of the attempt to exercise "Tyranny over the Mind of Man".

Dealing with so important a production, it is doubtful if he was concerned with "book burning" enough to remember its details five years later. Of course, as suggested at the trial, some of the treatment of the ideas may have lingered in his mind. And if he remembered them later, the principle of "unconscious

piracy" with which the Court of Appeals dealt with in Harold Lloyd Corp. v. Witwer, 9 Cir., 1933, 65 F.2d 1, 23, would apply:

"In the case at bar, if it be assumed that there are such similarities between the story and the play as to provoke in the same casual observer the consciousness that there is such a similarity between them, and that copying may be inferred therefrom, *we are still confronted with the fact that mere similarity does not necessarily involve literary piracy or an infringement of a copyright. Such similarities then as exist would require further analysis to determine whether or not they are novel in the story and thus copyrightable.*" 65 F.2d at page 23. (Emphasis added.)

I find that no access is shown, so as to warrant the conclusion that, unconsciously perhaps,[2] there was in the play a substantial copying of the Bradbury books. More, as will appear further on in the opinion there *was no copying at all.*

## II

### The "Theme" Involved

Jefferson, towards the end of his life, spoke of the ever-recurring struggle to preserve

"the palpable truth that the mass of mankind has not been born, with saddles on their backs, nor a favored few booted and spurred, ready to ride them legitimately." (Quoted by Julian P. Boyd, Jefferson's Final Testament of Faith, The New York Times Magazine, April 10, 1949, pp. 11, 38)

Since Socrates was compelled, in 399 B.C., to drink the poison hemlock, through the Dark Ages, the Inquisitions and their modern counterparts, there has been a conflict between man's own conscience and the desires of the State or

2. See, Twentieth Century-Fox Film Corp. v. Dieckhaus, 8 Cir., 1946, 153 F. 2d 893, 898; and see, Unconscious Plagiarism, in Note, Literary or Artistic Property Rights, 23 A.L.R.2d 244, at pages 340–341.

of the majority to enforce conformity and to outroot dissidence. Freedom from restraint in expressing ideas is a comparatively modern historical innovation. Indeed, the American Constitution in the First Amendment expressed an ideal far ahead of the times. (See the writer's book, "The Nature of Our Freedom," 1950, especially Chapter VII, "The American Bill of Rights") And the writers of books expounding new or disturbing ideas have not been favored by constituted authority.

An Italian scientist of distinction, writing in English, has recently expounded the problem as it relates to scientific thought in discussing the trial of Galileo by the Roman inquisition in 1633. In the preface to the book, the author contrasts the events and personages in the Galileo trial with some more contemporaneous events in the scientific world. (See George de Santillana: The Crime of Galileo, 1955, U. of Chicago Press)

There is a legend that François Rabelais, who lived in France in the Sixteenth Century, escaped persecution from the Inquisition not only by going into hiding, but by also pretending to be insane. Yet *Gargantua* and *Pantagruel* are now considered among the world masterpieces.

Burning of heterodox books and persecution of those writing them is not new. Hitler's burning of books and destruction of persons is not yet forgotten. Erich Maria Remarque dramatized the tortures and the destruction of lives in "Der Funke Leben", (The Spark of Life) which, if memory serves, was made into an American motion picture. So has the Italian writer, Malaparte (pseudonym of Curzio Zuckert) who witnessed some of Hitler's diabolical executions as an Italian observer with the German armies in Eastern Europe in his book, "Kapputt", published in 1944, an English translation of which appeared in 1946.

Among other books which, in recent years, dealt, either in Utopian form or in retrospect, with the attempts of governments to control thought, no matter how expressed, or to criticize past action are: George Orwell: "Nineteen Eighty Four"; Ernst Junger: "Heliopolis"; Jean-Paul Sartre: "Red Gloves" (Les Mains Sales); Sidney Kingsley: "Darkness at Noon"; Manès Sperber: "The Burning Bramble (Et Le Buisson Devint Cendre); Bruner E. Werner: "The Slave Ship" (Die Galeere); Aldous Huxley: "Brave New World". The titles of some of these books were brought out in discussion with the experts. Others have come to mind in writing the opinion, as have also some of the historical facts to be found in the opinion.

This procedure finds sanction in the law. For, in the last analysis, in cases of this character

> "conclusions of experts are useful only in directing the court's attention to alleged similarities in theme and atmosphere, or as to the supposed identity of characters appearing in the book and the play. *These opinions cannot, however, be substituted for the court's opinion.*" Simonton v. Gordon, D.C.N.Y.1924, 297 F. 625, 626. (Emphasis added.)

As said in an earlier case:

> "*It is the court, and not expert witnesses, who must determine the question whether one's copyright has been infringed.*" (Encyclopaedia Britannica Co. v. American Newspaper Assn., 1904, D.C.N.J., 130 F. 460, 462) (Emphasis added)

Judge Learned Hand in the Nichols case stressed the importance of a judge's reliance on his own "impressions" rather than the metaphysical generalizations of authors or experts:

> "Argument is argument whether in the box or at the bar, and its proper place is the last. The testimony of an expert upon such issues * * * contributes nothing which cannot be better heard after the evidence is all submitted. * * * For the more the court is led into the intricacies of dramatic craftsmanship, *the less likely it is to stand upon the firmer, if more naive, ground of its considered impres-*

738

*sions upon its own perusal."* Nichols v. Universal Pictures Corp., 2 Cir., 1930, 45 F.2d 119, 123.

And the late Judge Jerome Frank of the same court, years later, summed up the problem in a pithy sentence:

> "On the issue of copying, it was *proper for the trial judge to avail himself of (although not to be bound by)* expert testimony." Heim v. Universal Pictures Co., Inc., 2 Cir., 1946, 154 F.2d 480, 488. (Emphasis added.)

This principle was stated many years ago in the House of Lords by Lord Blackburn in these words:

> "\* \* \* *an idea may be taken from a drama and used in forming another without the representation of the second being a representation of any part of the first.* For example:—*I* have no doubt that *Sheridan,* in composing *'The Critic'* took the idea from *'The Rehearsal,'* but I think it would be an abuse of language to say that those who represent *'The Critic,'* represent *'The Rehearsal,' or any part thereof; and if it were left to me to find the fact, I should, without hesitation, find that they did not.*
>
> "On the other hand, in composing *'The Trip to Scarborough,'* Sheridan took so much from *'The Relapse'* that if it were left to me to find the fact, *I should find that those who represent 'The Trip to Scarborough' do represent parts of 'The Relapse'."* (Chatterton v. Cave, 1878, 3 App. Cas. 483, 501) (Emphasis, except as to titles, added.)

 The judge in determining similarities is not confined to a comparison of the works involved. He may draw upon his own knowledge of literary matters in determining whether the pattern is of a type which, having been used in other works, can be given the protection of the copyright law. Or, as it has been put, whether the copying, if any there was, was "permissible" or "illicit". See,

Arnstein v. Porter, 2 Cir., 1946, 154 F.2d 464, 472; Universal Pictures Co., Inc., v. Harold Lloyd Corp., 9 Cir., 1947, 162 F.2d 354, 361. And see, Golding v. R. K. O. Pictures, Inc., 1950, 35 Cal.2d 690, 695, 221 P.2d 95; Stanley v. Columbia Broadcasting System, Inc., 1950, 35 Cal.2d 653, 662, 221 P.2d 73, 23 A.L.R. 2d 216. The judge is permitted to do so because it is assumed that

> "Courts have judicially the same knowledge as the community at large of matters of literature embraced in average education or reading." 31 C.J.S. Evidence § 70.

He may also take judicial notice of

> "facts that appeared \* \* \* abundantly from standard works accessible in every considerable library." Werk v. Parker, 1919, 249 U.S. 130, 133, 39 S.Ct. 197, 198, 63 L.Ed. 514.

So expert testimony, even of the highest type, *need not be substituted* for a judge's own conclusion arrived at from his own study of the matters involved. For this reason the testimony of experts has always been considered to be "in the nature of secondary evidence". (Lawrence v. Dana, 1869, Fed.Case No. 8, 136, 15 Fed.Cas. p. 26 at p. 56. See 18 C.J.S., Copyright and Literary Property, § 156, p. 271)

## III

### Originality

 Concededly, "ideas as such are not subject to copyright." Funkhouser v. Loew's, Inc., 8 Cir., 1953, 208 F.2d 185, 189. See, Alexander v. Irving Trust Co., D.C.S.D.N.Y.1955, 132 F.Supp. 364, 367, affirmed 2 Cir., 1955, 228 F.2d 221. And originality of the slightest degree is sufficient. Alfred Bell & Co. v. Catalda Fine Arts, Inc., 2 Cir., 1951, 191 F.2d 99, 102–103; Kustoff v. Chaplin, 9 Cir., 1941, 120 F.2d 551; American Visuals Corp. v. Holland, 2 Cir., 1958, 261 F.2d 652. The choice of *locale* for a story does not, necessarily, spell originality. Echevarria v. Warner Bros. Pictures, Inc., D.C.1935, 12 F.Supp. 632; Cain v. Universal Pic-

tures Co., Inc., D.C.1942, 47 F.Supp. 1013; Schwarz v. Universal Pictures Co., Inc., D.C.1945, 85 F.Supp. 270.

■ Copyrightability lies in the manner or method of developing an idea. To determine whether there is copying in a play we place ourselves in the position of the ordinary viewer and ask: Would he see similarity, *not in the idea,* but in the incidents, the sequence of events, the development and interplay of the characters and the dénouement? Originality lies in "the pattern of the work". (Zechariah Chafee, Jr., "Reflections on the Law of Copyright", I, 1945, 16 Col. Law Rev. 503, 513)

■ Judge Learned Hand has reduced the phrase to its legal significance by insisting that *the law protects not the general pattern, but its expression,* in these words:

"* * * the defendants were entitled to use, not only all that had gone before, but even the plaintiffs' contribution itself, *if they drew from it only the more general patterns; that is, if they kept clear of its 'expression'."* Sheldon v. Metro-Goldwyn Pictures Corp., 2 Cir., 1936, 81 F.2d 49, 54.[3]

## IV

### Critical "Dissection"

In making a comparison between two works we were warned years ago by a noted Judge, Charles M. Hough, that there was no plagiarism when

"it requires dissection rather than observation to discern any resemblance." Dymow v. Bolton, 2 Cir., 11 F.2d 690, 692.

Later, another judge of the same court, Learned Hand, after referring to the statement amplified the thought:

*"Technical analysis 'is not the proper approach to a solution; it must be more ingenuous, more like that of a spectator, who would rely upon the complex of his impressions * * *'.* Nichols v. Universal Pictures Corp., 2 Cir., 45 F.2d 119, 123. Without proof that there is similarity .in a substantial sense there can be no finding of infringement. Marks v. Leo Feist, Inc., 2 Cir., 290 F. 959." Arnstein v. Broadcast Music, Inc., 2 Cir., 1943, 137 F.2d 410, 412. And see, Universal Pictures Co., Inc., v. Harold Lloyd Corp., 9 Cir., 1947, 162 F.2d 354, 361.

And our own Court of Appeals, although finding in the particular case similarities between two works, rejected *critical analysis* as the test, saying:

"We are of opinion that such similarities as exist between the play and the story, and there are many, *are such as require analysis and critical comparison in order to manifest themselves.* The outstanding feature, the climax of both story and play, is the football game, with necessarily some similarity, but there is nothing new and novel in that other than the unusual participation of the heroes in their respective games, and on analysis these are neither identical nor similar in scene nor in conception of the two productions, but, if this be doubted, as was done by the trial court, then it is clear that there is no such similarity as overcomes the positive testimony that there was in fact no copying." Harold Lloyd Corp. v. Witwer, 9 Cir., 1933, 65 F.2d 1, 28. (Emphasis added.)

■ The test is pragmatic. An expert may, by "dissection" or "abstraction", in generalized terms, find similarity everywhere. Almost any dramatic story can be reduced to a metaphysical abstraction. Nathaniel Hawthorne's

---

3. See, Dellar v. Samuel Goldwyn, Inc., 2 Cir., 1945, 150 F.2d 612; Eisenschiml v. Fawcett Publications, 7 Cir., 1957, 246 F. 2d 598, 603. This principle is now generally accepted in Anglo-American law.

See, Note, Literary or Artistic Property Rights, 1952, 23 A.L.R.2d 244, at pages 272–280; Copinger and Skone James on Copyright, 9th Ed., 1958, pp. 1 et seq., 35, 39–40, 57, 143.

740

"Scarlet Letter" is a story of sin. Thomas Hardy's "Tess of the d'Urbervilles" deals with a girl's betrayal. Gustave Flaubert's "Madame Bovary" and Leon Tolstoi's "Anna Karennina" are stories of adultery. An ordinary killing of a girl by her lover gave us Theodore Dreiser's "The American Tragedy". Stendhal's (Marie Henri Beyle) great "Le Rouge et Le Noir" (The Red and the Black) was based on the story of a young murderer executed in France in 1828. Reduced to their simplest form, the themes of these outstanding novels are trite. Yet genius transformed, in each instance, the base material of an ordinary incident into a work of distinguished literary merit. And the history of literature indicates clearly what literary creativeness can do with ordinary incidents or with historical facts, which are the common property of mankind.

There are few original dramatic situations. The study of literature shows deliberate borrowings from common sources by the great and near great. Many of Shakespeare's plays are based on stories actually taken from Boccacio and other less known writers. Romeo and Juliet found its source in an Italian "novella", dealing with the feud between the Capulets and Montagues. Out of a simple story came the great characterization of Romeo and Juliet, of which William Hazlitt, the well-known English critic, said:

"If it has the sweetness of the rose, it has its freshness too; if it has the languor of the nightingale's song, it has also its giddy transport; if it has the softness of a southern spring, it is as glowing and as bright. * * * Everything speaks the very soul of pleasure, the high and healthy pulse of the passions: the heart beats, the blood circulates and mantles throughout." (William

Hazlitt, "Characters of Shakespeare's Plays", Everyman's Ed., 1915, p. 104)

In addition to the main characters, we have Mercutio, Tybalt, Benvolio, the nurse and others. Other comedies, like "The Two Gentlemen of Verona", "Twelfth Night", "All's Well That Ends Well", are also taken from Italian sources. But the characters of Launce, Speed, Julia, in "The Two Gentlemen of Verona", of Malvolio and Viola in "Twelfth Night", Helena in "All's Well That Ends Well", are fashioned by a master craftsman, who transmuted ordinary metal into brilliant gold. And therein lies their originality. See the writer's article "Originality in the Law of Intellectual Property", 1951, 11 F.R.D. 457, 472–473.[4]

### V

### Similarities and Dissimilarities

A. *Totalitarianism and Thought Control*

■ In the light of these facts and principles, the problem before us is not difficult of solution. Granted that the main theme of the Bradbury books and the Aurthur play is "Tyranny over the mind of Man", and the rebellion of free spirits against it, the treatment is entirely different. Change of locale to a future society does not, as already stated, give a writer the right to deny, *in secula seculorum*, the right of others to a similar locale.

Orwell, Huxley and Junger, in the books mentioned, *transported modern conflicts of ideas into the future*. Long before either of the authors involved here wrote on the subject, totalitarianism with its censorship of books and ideas was a fact. So were the Inquisition and the burning of people and books old historic facts. Aldous Huxley has given a graphic description of the torture and

---

**4.** And Courts have warned us repeatedly against the *obsessive conviction* "so frequent among authors * * * that all similarities between their works and any others which appear later must inevitably be ascribed to plagiarism." Dollar v. Samuel Goldwyn, supra, Note 3, 150 F.2d at page 613.
And see, Ricker v. General Electric Co., 2 Cir., 1947, 162 F.2d 141, 144.

burning of an heretical priest in "The Devils of Loudun".

The mediaeval Inquisition which began early in the thirteenth century and was used in the South of France and Northern Italy, Germany and the Papal States is an historical fact. In the Papal States it continued until the nineteenth century. While burning for heresy was the exception rather than the rule, the Spanish Inquisition established in the fifteenth century by Ferdinand V and Isabella and first headed by Tomàs de Torquemada, is known for the cruelty of its first Inquisitor General. It continued into modern times. Even persons who were later sainted like St. Ignatius of Loyola, the founder of the Jesuit Order and St. Theresa of Avila were not free from the investigations of the "Inquisitions" to determine possible heresy.

Burning at the stake for heresy became an established custom in Spain. And, while historians now assert that the number of 8000 persons burned at the stake, given by older historians, is probably exaggerated, it is conceded that they amounted to at least 2000. (See, The Columbia Encyclopedia, 2nd Ed., 1950, p. 962 (*Inquisition*); Id. p. 1994 (*Torquemada*))

B. *"Torquemada" and "Fire"*

In 1882 Victor Hugo wrote a play entitled "Torquemada" in which he dramatized the life of the Dominican monk, Tomàs de Torquemada, who in 1483 became Inquisitor General of Castile and Aragon. The play has been translated into English. (See, The Dramatic Works of Victor Hugo, Vol. II, "Torquemada", translated by George Burnham Ives, Copyright by Little, Brown & Co., 1909, p. 345) The play is written in verse in the romantic manner which Victor Hugo made famous. Persons who have read the play or seen it performed have been impressed by some of its great scenes such as Torquemada's pilgrimage to Rome which enables him to secure approval from the Pope, Sixtus IV, himself a Spaniard, of the Inquisition, the scene in which when the King and Queen, urged by the Marquis of Fuentel, are about to

revoke the Order for the burning of one hundred Jews in one day, and to revoke the edict for their expulsion, on the payment of a ransom of thirty thousand gold crowns, he makes them stand by both orders.

These, to me, while in the great dramatic tradition, are not significant in the discussion before us. For, at no time during this period does Torquemada have any misgivings about his mission. Indeed, in his interrogation at the end of the first Act, when he is about to be consigned to an open sepulchre or cavern after being found guilty of heresy by the Bishop of Urgel, he grows almost dithyrhambic over the saving qualities of "fire". In his words:

"The Monk: This tolerance, in sooth, appalleth me. The flames of hell burn with a fiercer blaze As wane those of the stake." (Victor Hugo, "Torquemada", Id., p. 385)

Even before he has *sensed* power, in his disputation in the countryside near Rome with Francis de Paule, which Pope Alexander VI, disguised as a hunter, heard, he chants the virtues of the flames for heretics:

"* * * It is sublime,
If so be that it be not scandalous.
He fain would punish, and I fain would save,
The fires of the stake are all extinct,
And 'tis my purpose to rekindle them." (Id., p. 397)

In the scene, after he had made the King and Queen stand by the orders given, he exultantly speaks of the stake:

"* * * The stake on earth
Doth quench the nether hell." (Id., p. 447)

and of fire and life as

"* * * bewildering vision of God's face!" (Id., p. 448)

To me there is no wavering in all this. Yet there is a moment of "wavering" in Torquemada's life which is very significant. For no human soul, no matter how

transfixed by a belief, is strong enough to forget human kindness. And Torquemada's last act in the play was one of unadulterated cruelty. For he consigned to the terrors of the Inquisition two young noble people in love with each other, Don Sancho de Salinas and Doña Rosa d'Orthez, who had saved his life earlier in the first Act, when they removed the flagstones placed over the entrance to the sepulchre where he would have been allowed to die by the Bishop of Urgel who had convicted him of heresy. In so doing, the youths used an iron cross as a lever with a rock as a fulcrum. At the end of the play, we find the two noble young people in a monastic retreat, to which they had been taken by the Marquis of Fuentel, who believed Sancho to be his son by a former Queen of Aragon, and desired them to go abroad and marry. Torquemada, who had been given one of the keys to the monastic retreat by the King's fool, Gucho, arrives on the scene. Upon recognizing the young people as the two who had saved his life, Torquemada is moved. In what follows, I shall give the French with the English translation in order that the rich quality of Hugo's poetry may be seen:

"Je vous retrouve tels que je vous
 vis d'abord.
Je n'étais plus vivant et je n'étais
 pas mort;
Vous m'êtes arrivés d'en haut comme
 deux anges;
Vous n'avez sauvé. Dieu, par des
 routes étranges,
Me ramène aujourd'hui, moi, dans
 votre chemin,
Vous appelez à l'aide et je vous tends
 la main."
\* \* \* \* \* \*
"Toi, captive,
Toi, captif, vous tremblez dans ce
 lieu noir, j'arrive.
Sans moi vous péririez. Sans vous,
 J'étais perdu.
Vous fûtes imprevus, je suis in-
 attendu.
Comment donc êtes-vous ici? Com-
 ment y suis-je.

Vous fûtes le miracle et je suis le
 prodige."

"You came to me, like angels, from
 on high,
And saved me. God by strange and
 devious ways
Today doth place me in your path
 once more.
You call for help, and I put forth
 my hand."
\* \* \* \* \* \*
"You, captives both,
Tremble with terror in this desert
 place,
And I appear. Without you I was
 lost.
Without me you would perish. Un-
 foreseen
Your coming was, and you looked
 not for me.
How came you here? How is it that
 I'm here?
You were the miracle, the portent
 I." (Id., p. 456) (The French text
is that contained in Volume II, Victor Hugo, Théatre, Paul Orlendorff Edition, Act II, Sc. 4, p. 45)

Even after they tell him how they used the iron cross to remove the flagstone to liberate him from entombment, which he considers *a grave sacrilege,* he, nevertheless, still feels that, as he owes his life to them it is his duty to save them from the King's possible attempts to separate them again. He leaves them with these words:

"Fear not. Yes, I will save you."
(Id., Act II, Sc. 4, p. 459)

Yet as the lovers embrace in the hope that the promise would be fulfilled and that Torquemada might even marry them and aid in their escape, the top of a black banner, which has in the center of it the cross and two skull bones in white, appears below. The banner bearer comes into view. The lovers see to the right and to the left the hoods of two files of penitents, black and white, the signal that they have been condemned by the Inquisition. The lovers "petrified with terror" realize that Torquemada has

failed them. Faced with inevitable death at the stake, the two youths greet it with a simple word, uttered by Don Sancho, "Ciel" (Heavens).

It should be added that the Inquisition was a State institution. Because offenses against the State religion were also offenses against the State, the State, *not the church,* inflicted torture, cruelties and death after guilt was pronounced. Intolerance of deviation or dissent is so integral a part of modern totalitarianism that a recent standard German Encyclopedia characterizes totalitarianism in this manner:

"die gesamte Staatsgewalt in der Hand einer Machtgruppe (Partei, Bewegung) zusammenfasst, die auch alle sozialen, wirtschaftl. und geistigen Lebensbereiche, zu beherrschen beansprucht. Der Ausschliesslichkeitsanspruch der Parteiideologie umfasst die Verpflichtung auf das Partei-programm, die Ausmerzung der legalen Opposition, die Unterdruckung 'staatsfeindlicher' Richtungen, den Terror gegen Andersdenkende, auch gegen 'Linienabweichung' in den eigenen Reihen." (Der Kleine Brockhaus, Vol. II, 1952, *Totalitärer Staat,* p. 526)

So, to paraphrase the German quotation just given, the totalitarian state which places all power in the hands of a power group which controls all economic, social and spiritual matters, demands the outrooting of all legal opposition and the persecution of all anti-state activities and "terror gegen Andersdenkende" (terror against those who think differently) or those in its own ranks who deviate from official teaching.

The tragedy of repression of man's free spirit, with the conflicts it engenders, is not new in history or in fiction. Raids to find dissident persons or books are not new. In our own country, during the regime of A. Mitchell Palmer as Attorney General under Woodrow Wilson, raids were quite common. And they

are a "blot on the escutcheon" of an otherwise enlightened administration.

### C. Treatment of the Theme

The treatment of the theme in the two books and in the play before us is different. While it is true that, in both instances, the means of becoming aware of the existence of dissident and "underground" readers is through a girl, the girls are different, as are the men. Bradbury's Clarisse is immature, 17 years old, and not connected with the State. Although there are hints of her "liking" Montag and Montag, at times, "thinks" about her with affection, no love interest actually comes into play. She disappears early in the books. Susan, by contrast, had lived with her parents in Canada in early childhood, and is a librarian-separator, in the service of the City-State. She "separates" technical books, *which are to be kept,* from purely literary books, *which are to be destroyed.* The strong sex love between her and Gordon dominates the play. She influences Gordon from beginning to end. Montag is just a fireman burning books. He has held a somewhat menial job, that of an ordinary fireman for ten years, not even rising from the ranks. He even "smells" of the kerosene with which he starts fires. Gordon is more like a trained inquisitor, a man of ideas, even if indoctrinated ones. It was a tradition of his family that his ancestors had been teachers. Montag burns books and, in one instance only is a life lost,—an old woman sets her house on fire, after the incendiary liquid is applied by the firemen, rather than to leave it.

Gordon is a high official in a totalitarian state, a conformist but a man of education. Montag talks about publishing books in the future with Faber, the former professor, and "planting" them in the houses of the firemen. Yet he manages to survive his heresy and ends up by reciting joyfully poetry to himself (in "The Fireman") or dreaming of peace after war breaks out (in "Fahrenheit 451"). Even the killing of Beatty by Montag, after the latter com-

pells him to burn his own house and books and knocks him down, seems unheroic. Gordon meets tragic and defiant death. His roommate and work-companion, Ben, who shares, at first, his conformism, after denouncing Gordon, "had picked up the books he dropped", was caught, beaten mercilessly and, with Gordon, condemned to death.

There is no counterpart to Ben in the Bradbury books. Montag's wife, Mildred, cannot, by any stretch of imagination, be called a substitute. Mildred is a conformist to the end. She never deviates or rebels. A disillusioned wife, she finds pleasure in opiates, narrowly escapes death on one occasion from an overdose of sleeping pills, and enjoys the propaganda and entertainment which the State provides. While on one occasion she protects Montag when, indiscreetly, in the presence of friends, he displays a book, she finally denounces him when she discovers the books he had hidden outside.

The use of quotations is not the same. Of course, the English Bible and Shakespeare are so much a part of our heritage that any problem dealing with books would mention them. The passage from the Bible used in the play is meaningful,

> " * * * And in the beginning there was darkness. And God said 'Let there be light and there was light'." (Genesis 1, 3)

So is the reference to Frank R. Stockton's story "The Lady or the Tiger". The quotation from Thoreau gives meaning to the play which defends the individual against "the compact majority". Ellis' lines, in context, give it added importance:

> "Thoreau once said, 'If a man does not keep pace with his companions perhaps it is because he hears a different drummer. Let him step to the music which he hears, however measured or far away.' *So we think of ourselves not as criminals but simply as people who hear different drummers."* (The quotation from Thoreau is taken from Walden, ch. XVIII, Conclusion, and is given in Bartlett's Familiar Quotations, 13th and Centennial Ed., 1955, p. 599, col. (b))

Montag merely expresses his joy as he reads or hears read, at various times, passages from authors.

## D. The Differences in "Mood"

Even if the "mood" be considered there is difference in the end products. Aurthur has produced a drama of the soul. Bradbury has not. Aurthur outlined his idea well in a letter dated March 19, 1957, in transmitting the first draft of the play:

> "I have a greatly oversimplified theory about writing that divides areas of conflict into three fields: 1) A man basically in conflict with himself who must primarily find a personal adjustment. 2) A man who has made some kind of personal adjustment comes into conflict with other people—family, or in the case of a love story, a girl, and must make some kind of readjustment. 3) A man basically adjusted to self and family who ventures into a conflicting society and must make an important readjustment."

At the trial, Aurthur stated that the cause of the conflict within Gordon was "disgust with killing". Gordon's fear was that he might kill his own parents from whom he was taken as a child, to be reared by the State. Even the promise by the analyst to reveal to him his parents does not make him falter. Nor does the promise at and after the trial by Ellis, the analyst, and the prosecutor to spare his life, in which Susan, under compulsion, no doubt, joined. So he chooses death, rather than to betray and kill more.

Bradbury deals with "science fiction", and his "mechanical hound" is a chief character. Aurthur deals with conflict

of ideas, within oneself, and with one's environment. According to Aurthur the story arose out of an incident told him of a member of one of Hitler's élite SS, who suddenly discovered that he was married to a non-Aryan, and was confronted with the conflict between his duty to her and that of his *élite corps*, and dramatist Arthur Miller's refusal to inform on his former associates before a Congressional Committee. These facts and the revelation at the end by Gordon, himself, that his motive for choosing death was his desire to "cease killing", support Aurthur's contention that his real theme is the biblical injunction "Thou shalt not Kill". (Exodus, 20:13)

In the bread baking and eating incidents there is a satiric tone as there is also in the scene in which Gordon, after being adopted by an old couple, celebrates the event by becoming intoxicated on *corn "likker"*, which they made. "Likker" and bread were both unknown in a society based on synthetic feeding. These and other incidents lend a charm and satiric tone to the play and emphasize the total inhuman character of the new society "under a plastic dome" in a manner which *does not* appear in the Bradbury books.

Aurthur condemns totalitarianism in all its phases, with book destruction as an incident. In Bradbury, book burning is the entire story, with emphasis on mechanical devices, such as the "mechanical hound", the ear-radio, stomach-pumping machines and the like. Aurthur has produced a tragic play. Bradbury's books are spectacular in a totally artificial, futuristic kind of way. Aurthur stresses ideas in conflict. Bradbury lays emphasis on new inventions and creations that perform man's work, even his pursuit of heresy.

*E. Stock and Familiar Situations*

In dealing with a problem of this character, stock situations, scènes à faire, cannot be avoided. See, Warshawsky v. Carter, D.C.D.C.1953, 132 F.

Supp. 758. They are not the materials to which the copyright monopoly attaches. Hence a raid, an historical fact applied to the future to discover dissidence or subversion, cannot be monopolized.

In many situations dealing with women, their love of the outdoors, the countryside and rain recur. From time immemorial, shepherds and shepherdesses, kings and queens, in disguise or otherwise, have cavorted over the greensward.

Traditionally, in romantic drama, the countryside is used as a locale for expressions of affection. Even in "Torquemada" the lovers, not knowing of their impending doom, tell Torquemada how they heard his cry from the sepulchre from which they saved him years before, while he was plucking roses and she chasing butterflies. Don Sancho adds:

"The words we whispered low in the sunlight

Were blended; * * *" (Id., "Torquemada", Part II, Act III, Sc. 2, p. 458)

And earlier in the play the scene itself is described with great charm and love of the outdoors, Don Sancho ending with the words:

" * * * 'Neath the boundless sky
God opens countless hearts and fills them all
With ecstasy and beams of wondrous light.
And none do say Him nay, none Him deny.
For all He does is good! " (Id., "Torquemada", Part I, Act I, Sc. 5, pp. 373–375)

So it is natural that one choosing a setting for a meeting between a man and a woman would bring in the countryside. Besides, in Aurthur's play, in order to enjoy any departure from the prescribed mode of behavior, the natural locale for escape would be the countryside, lying beyond "the domed" city.

The use of television, even wall to wall television, as a means of communication and thought control cannot be appropriated. The "mechanical hound" in Bradbury, a steel and electronic monster designed to track, catch and kill, has no counterpart in the play. In one of the Exhibits introduced by the plaintiff, Bernard Wolfe, the writer, who was to write the television play from Bradbury's "Fahrenheit 451", pointed to the difficulties which the "hound" would present in turning the book into a television play. The memorandum concluded:

"As I see it, these are the major problems: the Mechanical Hound; wall to wall television; the chase sequence. In addition, we must handle the house burning, the killing of Beatty, the gadgets called the 'Seashell' and the 'Green Bullet'."

The analyst's role in enforcing conformity ("I speak the truth", "Reading is treason to be punished by death") in Aurthur's play is significant and meaningful. So is Ellis' part, Inquisitor and heretic. In the end both characters are used in futile attempts to save Gordon by urging him to implicate others. There are no comparable characters in Bradbury. The trial scenes in the play are, both in the dialogue and execution, superb dramatic incidents. No similar incidents occur in Bradbury. The breaking out of war is, in Bradbury, by comparison, an anti-climax.

The part of women in either urging conformity or dissidence is not new. It is in Sartre and Orwell in the books already mentioned.

Ever since the institution of marriage was established it has become a custom to shift responsibility to one's mate. In "Torquemada" the King, when urged by the Marquis of Fuentel to revoke the order under which, on a certain day, one hundred Jews were to be burned, and to accept the large sum of gold as ransom from the Jews for revoking the edict to expel them from Castile and Aragon, indicates his own willingness but blames the Queen in these words:

" * * * My wife doth preach at
 me;
The Pope as well. And both most
 exigent.
I needs must let them burn the folk
 a bit;
Else should I have no peace. * * * "
(Id., "Torquemada", Part II, Act II,
Sc. 2, pp. 425–426)

In the American "pattern" the influence of women on men, for good or evil, *mostly good,* whenever they come into association is taken as an irrevocable fact of life. The American woman *is never neutral in our fiction.*

There is dissimilarity even in the treatment of the bad characters—the "villains". Aurthur's bad characters, Kimbrough, the prosecutor, and the analyst, are still human beings, in spite of their bestiality. Bradbury's Beatty and Mildred have become dehumanized robots. The "feelings" which the endings engender are distinct. While *Montag* expresses hope that a new society will rise Phoenix-like, from the ashes of the old one destroyed by war, one wonders how this will be accomplished by men of little vision like Montag or Faber, the former English professor, who preaches "caution" at all times. By contrast, Aurthur's Susan, Gordon and Ben, by their heroic immolation, are in the tradition of the martyrs of all ages and give rise to the hope that so long as persons of that type are bred there is hope to unshackle the chains of even the most vicious tyranny.

In short, assuming that the theme is the same, the method of expression, the plots and incidents, in their development, the unfoldment of the stories, the characters and their interplay are totally dissimilar. Such similarities as exist are fortuitous, inherent in the situation.[5]

5. See, Judge Wm. C. Mathes' opinion in Lake v. Columbia Broadcasting System, Inc., D.C.Cal.1956, 140 F.Supp. 707; Becker v. Loew's, Inc., 7 Cir., 1943, 133

This is not to deny originality to Bradbury. He is original in these books. So is Aurthur. Aurthur deals with a "conformist society" as a whole. Bradbury *does not*. As Aurthur stated in his notes to directors, accompanying the final script:

> "Vitally important is the fact that, because *Security* is the end-all goal, we see a people who have, if not literally, at least symbolically, crept back into the womb. Their cities are constructed under enormous plastic domes giving them complete control over weather, temperature, etc. * * * Because ideas and group thinking are the heresy of the day, individuals have become increasingly isolated from one another. * * *

> "Nothing is designed to shock, only to lull. * * *

> "Peace, comfort, warmth and quiet:—This is a society where no sound rises above a whisper. In short, perfection!"

So even the "aura" of the play, as Bradbury called it, is not the same.[6]

---

F.2d 889. In Rosen v. Loew's, Inc., 2 Cir., 1947, 162 F.2d 785, 788, Judge Learned Hand, in speaking of the inevitable similarities inherent in certain situations, condemns what he calls "gossamer similarities" to which plaintiffs in copyright cases resort:

"The details on which the plaintiff relies as copied, were nearly inevitable; certainly to be expected in a dramatic composition dealing with the place and period. *The burning of the Jewish books was known all over the world;* it was natural to select it for the play in the United States. The scholars who rioted because their teacher was a Jew readily suggested itself to any one; and the manner of its treatment was totally different in the scenario and the play. * * *

"In copyright we have become accustomed to actions without shadow of merit. Apparently the conviction of which authors and composers cannot be dis-

## Summary and Conclusion

One final observation. Both Bradbury and his expert stressed similarities only. Bradbury saw similarities between his books and the play from beginning to end. His expert admitted that the similarity extended only to the first part of the books, ending somewhere on page 64 in "Fahrenheit 451". After that, he said, the development of the play is "entirely different" from Bradbury.

 In resolving a problem of this character we are under obligation to discuss both similarities and dissimilarities. See, Cain v. Universal Pictures Co., Inc., D.C.Cal.1942, 47 F.Supp. 1013; Schwarz v. Universal Pictures Co., Inc., D.C.1945, 85 F.Supp. 270. It is true that the copying of a single sequence may amount to plagiarism if it is important. Universal Pictures Co., Inc. v. Harold Lloyd Co., 9 Cir., 1947, 162 F.2d 354, 361. But when similitude is sought to be established between two works, the points of essential difference may

> *"so far outnumber the points of similarity that it is difficult to understand how any one could persuade himself that the one was borrowed*

---

abused, extends to their assignees; that *the finest gossamers of similarity can be made to serve. The prizes are large; the security of the foundation often seems to be in inverse proportions."* (Emphasis added)

**6.** It would unduly extend this opinion to attempt to give a complete outline of the two Bradbury books and contrast scene by scene in them with the play's script as written or viewed by the Court. There is no summary of them in the record which would be accepted by either side. And I do not feel that such minute comparison would justify the labor involved, or would help in future cases. The similarities and dissimilarities pointed out in the text and drawn from a reading and study of the two books and of the script of the play and the view of the play are sufficient to indicate the bases for the conclusion reached. Those seeking more may go to the record.

*from the other."* Hubges v. Belasco, C.C.N.Y.1904, 130 F. 388. (Emphasis added) [7]

This is the situation here.

We conclude, therefore, that the Aurthur play does not infringe, in whole or in part, Bradbury's works and that no plagiarism has been shown.

Judgment will, therefore, be for the defendants that plaintiff take nothing by the complaint.

Costs to the defendants. No attorneys' fees. Findings and Judgment to be prepared by counsel for the defendants under Local Rule 7.

---

7. Lord Mansfield, many years ago, expressed the same thought when he wrote: " * * * *there must be such a similitude as to make it probable and reasonable to suppose that one is a transcript of the other, and nothing more than a transcript."* (Sayre and others v. Moore, 1785, as quoted in footnote to Cary v. Longman and Reese, (1892) 3 Ch. 469, 1 East 359, 102 English Reports (K.B.) 138, 139-140, footnote (b)).