## DAM v. KIRK LA SHELLE CO.

(Circuit Court of Appeals, Second Circuit. January 11, 1910. On Petition for Modification of Order for Mandate, February 16, 1910.)

### No. 70.

1. LITERARY PROPERTY (§ 6*)—SALE OF STORY BY AUTHOR WITHOUT RESERVATION—COPYRIGHT BY PURCHASER—DRAMATIC RIGHTS.

A sale by the author of a story to a magazine publishing company and delivery of the manuscript, and the acceptance of a sum of money "in full payment for story" without any further agreement, was in legal effect an absolute sale without reservation, carrying with it as an incident of ownership the exclusive right to dramatize the story when copyrighted under Rev. St. § 4952, as amended in 1891 (U. S. Comp. St. 1901, p. 3406), which provides that "authors or their assigns shall have the exclusive right to dramatize and translate any of their works for which copyright shall have been obtained under the laws of the United States."

[Ed. Note.—For other cases, see Literary Property, Dec. Dig. § 6.*]

2. COPYRIGHTS (§ 39*)—EXTENT OF RIGHTS ACQUIRED—COPYRIGHT OF MAGAZINE.

The filing of the title of a magazine for copyright by the publisher and the insertion of the proper notice is sufficient to secure a copyright of a story published therein and protect the right to dramatize the same where the publisher is the owner of both the story and the dramatic rights.

[Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 39.*]

3. COPYRIGHTS (§ 63*)—INFRINGEMENT—DRAMATIZATION OF COPYRIGHTED STORY.

A playwright who appropriates the theme or plot of another's story, protected by copyright, as the basis of a play, cannot escape a charge of infringement by adding to or slightly varying the incidents, or by adding to the number and changing the names of the characters.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 59; Dec. Dig. § 63.*]

4. COPYRIGHTS (§ 87*)—INFRINGEMENT—DAMAGES RECOVERABLE.

The owner of the copyright of a story which has been infringed by another by appropriating the story as the basis of a play is entitled to re-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

cover as damages all of the profits made by the infringer from the production of such play; there being no other practicable measure of damages.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 81; Dec. Dig. § 87.*]

Ward, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the Southern District of New York.

Suit in equity by Dorothy Dorr Dam against the Kirk La Shelle Company. Decree for complainant (166 Fed. 589), and defendant appeals. Affirmed.

This was a suit in equity brought in February, 1906, by Henry J. W. Dam to restrain an alleged infringement of a copyright. The original complainant died in April, 1906, and the suit was subsequently revived in the name of the administratrix of his estate, the present complainant. The Circuit Court held that the defendant had infringed the copyright in question and rendered a decree for an injunction and an accounting. The defendant has appealed.

The following are material facts:

During the year 1898 said Dam, who was an author and dramatist, wrote a story entitled "The Transmogrification of Dan." In 1901 Dam sent the manuscript of this story to the Ess Ess Publishing Company, a New York corporation and the proprietor and publisher of a monthly magazine called the Smart Set. The editors of the magazine accepted the story, and fixed the price to be therefor at $85. The business office of the publishing company then sent a check to Dam for that amount with a receipt for his signature, which was duly signed and returned. The receipt reads as follows: "July 12th, 1901. Received of Ess Ess Publishing Company $85, in full payment for story entitled 'The Transmogrification of Dan.' H. J. W. Dam." Dam had no personal interview with any of the officers or employés of the publishing company, and the entire transaction with respect to the acquisition of the story is described in the foregoing statement.

The story was published in the number of the Smart Set for September, 1901. This number as a whole was duly copyrighted in the name of the Ess Ess Publishing Company and bore a notice in the front part thereof, "Copyright 1901 by Ess Ess Publishing Company." The magazine contained no other notice of copyright, and no steps were taken either by the publishing company or by Dam to copyright the story separately. On October 27, 1905, the Ess Ess Publishing Company, without any monetary consideration, assigned to said Dam its copyright of said number of the Smart Set magazine so far as it applied to, covered, or protected said story, all its interest in said story under said copyright, and its claims and demands then existing for the infringement of said copyright.

The defendant is a New York corporation engaged in the general theatrical business. At various times between September 4, 1905, and the commencement of this suit the defendant caused a play entitled "The Heir to the Hoorah" to be publicly performed in various theatres in the United States. This play was written and copyrighted by Paul Armstrong, a dramatist, and was presented by the defendant through an arrangement with him. On November 15, 1905, said Dam, by his attorney, notified the defendant that said play was an unlawful dramatization of said story and forbade its future production. The defendant, however, continued to produce said play and this suit was brought.

In his original bill of complaint, Dam alleged, in substance, that he assigned to the publishing company the right to publish and print said story as a part of said magazine, and not otherwise, and that the right to dramatize said story was held by the publishing company as trustee for his benefit.

In an affidavit made for the purpose of obtaining a preliminary injunction Dam swore as follows: "I have not at any time parted with any right or in-

terest in said literary work entitled 'The Transmogrification of Dan' except the right for publication thereof in said number of 'The Smart Set' for September, 1901."

The amended bill of complaint alleged simply that Dam sold and assigned said story to the Ess Ess Publishing Company.

Stover, Hall & Freeman (John W. Griggs, Martin L. Stover, and George W. Betts, Jr., of counsel), for appellant.

Andrew Gilhooly, for appellee.

Before COXE, WARD, and NOYES, Circuit Judges.

NOYES, Circuit Judge (after stating the facts as above). The first question of law arising upon the foregoing facts is whether the Ess Ess Publishing Company by virtue of its transaction with Dam became the absolute proprietor of the story in question or acquired merely the right to publish it in the Smart Set magazine. If the statement made by Dam in his original bill and his affidavit could be accepted as correctly defining the rights of the parties, the publishing company acquired only a qualified right to the story. But the entire transaction with respect to the acquisition of the story by the publishing company has been stated. Even if Dam's statements as to his interpretation of the transaction were contrary to his later claims or against his interest, they could not change what actually took place nor the legal conclusion to be drawn therefrom. This conclusion must be drawn by the court. No principle of estoppel is present.

Now, as a matter of law, it seems possible to draw only one conclusion from the facts surrounding the acquisition of the story by the Ess Ess Publishing Company, and that is that it became the purchaser, and, consequently, the proprietor, of the work with all the rights accompanying ownership. The author offered the story. The publisher accepted and paid for it, and the author transferred it without any reservations whatever.

While it is probable that an author in assigning the right to publish and vend his work may retain and reserve the rights of translation or dramatization (Ford v. Blaney Amusement Co. [C. C.] 148 Fed. 642), a sale or assignment without reservation would seem necessarily to carry all the rights incidental to ownership. And a transaction in which an author delivers his manuscript and accepts a sum of money "in full payment for story" cannot be regarded as a sale with reservations. The courts cannot read words of limitation into a transfer which the parties do not choose to use.

The copyright statute in force at the time of this transaction (Rev. St. § 4952, as amended in 1891 [U. S. Comp. St. 1901, p. 3406]) provided that the "proprietor of any book * * * shall upon complying with the provisions of this chapter have the sole liberty of * * * publishing * * * and vending the same." It further provided that:

"Authors or their assigns shall have the exclusive right to dramatize or translate any of their works for which copyright shall have been obtained under the laws of the United States."

We think it the better view that the Ess Ess Publishing Company by virtue of its transaction with Dam became the absolute proprietor of the story "The Transmogrification of Dan" and was entitled to the exclusive right to dramatize it.

The next question is whether the publishing company as proprietor of the story duly complied with the statute and obtained a valid copyright protecting the dramatic rights. No question is raised but that the publishing company took all the steps required by the statute to enter for copyright in its own name the number of the Smart Set magazine containing the story under the title of the magazine. It is claimed, however, that such steps accomplished no more than to obtain such protection as the publishing company needed as publishers of the magazine.

Assuming that Dam retained the dramatic rights to the story, there would be much force in this contention. In such a case we doubt very much whether the steps which the publishing company took to copyright its magazine, especially in view of the form of the copyright notice, would have been sufficient to protect the dramatic rights.

It is true that Mifflin v. White, 190 U. S. 260, 263, 23 Sup. Ct. 769, 770, 47 L. Ed. 1040 (decided in 1903), the Supreme Court said that:

"Without further explanation it might perhaps be inferred that the author of a book who places it in the hands of publishers for publication, might be presumed to intend to authorize them to obtain a copyright in their own names."

And it is said in Drone on Copyright, p. 260:

"A person who is not the author or owner of a work may take out the copyright in his own name, and hold it in trust for the rightful owner. Thus when an article has first been published in a cyclopædia, magazine, or any other publication, the legal title to the copyright, if taken out in the name of the publishers, will vest in him. But it may be the property of the author, and held in trust for him. And the same is true while the copyright of a book which belongs to the author is entered in the name of the publisher. In such case a court of equity, if called upon, may decree a transfer of the copyright to be made to the owner."

The difficulty is that the Supreme Court in the Mifflin Case, supra, after holding that in certain cases there may be a presumption of intention to authorize the copyright of a work by the publishers, said that, assuming the existence of such authority, there was an additional question, viz.: Whether the entry of a magazine by its title in the name of its publisher is equivalent to entering a book by its title in the name of its author. And the Supreme Court said:

"The object of the notice being to warn the public against the republication of a certain book by a certain author or proprietor, it is difficult to see how a person reading these notices would understand that they were intended for the protection of the same work. On their face they would seem to be designed for entirely different purposes. While owing to the great reputation of the work and the fame of its author, we might infer in this particular case that no publisher was actually led to believe that the book copyrighted by Dr. Holmes was not the same work which had appeared in the Atlantic Monthly, that would be an unsafe criterion to apply to a work of less celebrity. It might well be that a book not copyrighted or insufficiently copyrighted by the author might be republished by another in total ignorance of the fact that it had previously appeared serially in a copyrighted magazine. It is incorrect to say

that any form of notice is good which calls attention to the person of whom inquiry can be made and information obtained, since, the right being purely statutory, the public may justly demand that the person claiming a monopoly of publication shall pursue, in substance at least, the statutory method of securing it. Thompson v. Hubbard, 131 U. S. 123, 9 Sup. Ct. 710, 33 L. Ed. 76. In determining whether a notice of copyright is misleading we are not bound to look beyond the face of the notice, and inquire whether, under the facts of the particular case, it is reasonable to suppose an intelligent person could actually have been misled. With the utmost desire to give a construction to the statute most liberal to the author, we find it impossible to say that the entry of a book under one title by the publishers can validate the entry of another book of a different title by another person."

See, also, Mifflin v. Dutton, 190 U. S. 265, 23 Sup. Ct. 771, 47 L. Ed. 1043.

In view of this decision by the Supreme Court, we think that had Dam retained the dramatic rights to his story the entry of the magazine and the notice of copyright would have been insufficient to protect them. A notice of the copyright of the Smart Set magazine by the Ess Ess Publishing Company is hardly equivalent to a notice that the story "The Transmogrification of Dan" is copyrighted by or in favor of H. J. W. Dam. In the case of the reservation of dramatic rights, in addition to the notice of the copyright of a magazine, it may well be that it should appear in some distinct way that such reservation of such rights to the particular article is made for the benefit of the author. Indeed, it may be that the author should contemporaneously take out in his own name a copyright covering such rights.

But this question need not now be determined. Having found that the Ess Ess Publishing Company became the proprietor of the story within the meaning of the copyright statute, the precise question is whether that corporation took sufficient and proper steps to protect the dramatic rights which belonged to it as assignee. In the first place, we think that the entry of the magazine containing the story with the notice in the magazine protected the story. The copyright law should receive a reasonable construction, and, in our opinion, it is not necessary that a copy of the title to each article in respect of which copyright is claimed should be filed nor that a notice should be inserted at the head of each article.

In Ford v. Blaney Amusement Co. (C. C.) 148 Fed. 644, Judge Holt said:

"The copyright act in my opinion should be liberally construed, with a view to protect the just rights of authors and to encourage literature and art. I think that the filing of the title of a magazine is sufficient to secure a copyright of the articles in it if they are written or owned by the proprietor of the magazine."

In Harper v. Donohue (C. C.) 144 Fed. 491, 496, upon an extended review of the authorities, it is said:

"The almost uniform practical construction of the copyright law has been to give the notice in connection with each number of a magazine and this has been often sustained."

In Drone on Copyright, p. 144, it is said:

"The copyright protects the whole and all the parts and contents of a book. When the book comprises a number of independent compositions, each of the latter is as fully protected as the whole."

As a corollary to the conclusion that the copyrighting by the Ess Ess Publishing Company of the Smart Set magazine protected the story "The Transmogrification of Dan" of which it was the proprietor, it follows that the dramatic rights to said story of which it was likewise the owner were protected. That which protected the story protected the incidents to the story.

The Ess Ess Publishing Company assigned its interest in the copyright of the story "The Transmogrification of Dan" to the author, together with its existing rights of action. We do not understand that any question is raised as to the sufficiency of this assignment. Considering the case thus far, then, we think that the complainant has established that she, as administratrix of Dam's estate, is the owner as assignee of the Ess Ess Publishing Company of a valid copyright covering the right to dramatize the story "The Transmogrification of Dan." The next question is whether the defendant has infringed.

We think it unnecessary to review the evidence in detail with respect to the question of infringement. The Circuit Court has carefully compared the story with the play, and we agree with its conclusion that the play is a dramatization of the story. The playwright expanded the plot. He made a successful drama. The story was but a framework. But the theme of the story is the theme of the play, viz., the change produced in the character of a husband by becoming a father.

It is, of course, true that the play has more characters than the story and many additional incidents. It is likewise true that none of the language of the story is used in the play, and that the characters have different names. But the right given to an author to dramatize his work includes the right to adapt it for representation upon the stage which must necessarily involve changes, additions, and omissions. It is impossible to make a play out of a story—to represent a narrative by dialogue and action—without making changes, and a playwright who appropriates the theme of another's story cannot, in our opinion, escape the charge of infringement by adding to or slightly varying his incidents.

It is undoubtedly true, as claimed by the defendant, that an author cannot by a suggestion obtain exclusive control of a field of thought upon a particular subject. If the playwright in this case without the use of the story, and working independently, had constructed a play embracing its central idea, it may well be that he would not have infringed the copyright of the story. But a comparison of the play with the story shows conclusively in many unimportant details that Armstrong read the story and used it as the basis of his play. It is practically impossible that the similarities were coincidences. Other testimony is to the same effect. In our opinion the playwright deliberately appropriated the story and dramatized it. The statute giving authors of copyrighted works the exclusive right to dramatize them must receive a reasonably liberal application, or it will be wholly ineffective. As we have just pointed out, the adaptation of a story to the stage must necessitate changes and additions. Few short stories could be transformed into dramatic compositions without the addition of many new incidents. Unless the copyright statute is broad enough to cover

any adaptation which contains the plot or theme of the story, it is wholly ineffective. If Armstrong by what he did, did not infringe the dramatic rights of this story, it is difficult to see what he could have done which would have infringed them.

We thus reach the conclusion that the defendant by the production of the play "The Heir to the Hoorah," infringed the copyright of the story "The Transmogrification of Dan." This conclusion would call for an affirmance of the decree without further discussion were it in the usual form. Questions as to the amount of damages or profits ordinarily come up for determination only after the accounting. The decree in this case, however, is very broad. It provides:

"That the complainant recover of the defendant the gains and profits made by it by making use of said play, entitled 'The Heir to the Hoorah,' by giving public performances thereof, by causing or licensing public performances thereof, to be given, or in any other way, form or manner."

As, therefore, the decree goes much further than to provide for the recovery of the profits derived from the use of the story and embraces all profits arising from the production of the play, it is necessary now to determine whether such comprehensive form is proper.

At the first consideration of the subject, it seems most unjust that the representatives of an author who was willing to sell his story for $85, who apparently never thought of dramatizing it, whose dramatization, if made, might have been wholly unsuccessful—indeed might never have been produced—who took no risks of an unsuccessful venture, should receive all the profits made by the defendant in the venturesome enterprise of producing and presenting the play—an enterprise involving the expenditure of time and money for the employment of actors, the preparation of scenery and costumes, the hiring of theatres, advertising and many other purposes. On the other hand, unless the complainant is entitled to all the profits arising from the production of the play, she is, as a practical matter, entitled to no pecuniary recovery at all. It is manifestly impossible for an author of a book or story which he has never dramatized to show that he has sustained any actual damage by the dramatization and production of a play based upon it. It is equally impossible for him to show the proportion of the profits accruing to a theatrical company from the use of a copyrighted theme or plot and the proportion accruing from the use of the scenery, the employment of favorite actors, and other sources. If in a case like the present an author cannot hold the theatrical company as his trustee and accountable for all the profits from the play, then it necessarily follows that all copyrighted but undramatized books and stories may be appropriated and used with impunity. The right to follow the theatrical company over the country and seek injunctive relief would involve great expense and be of little avail. Notwithstanding the hardships imposed upon the defendant by the decree in this case, we think that no other decree gives effect to the copyright statute, and that it is supported by the authorities. Thus in Callaghan v. Myers, 128 U. S. 617, 666, 9 Sup. Ct. 177, 191, 32 L. Ed. 547, the Supreme Court of the United States by Mr. Justice Blatchford said:

"In regard to the general question of the profits to be accounted for by the defendants as to the volumes in question, the only proper rule to be adopted is to deduct from the selling price the actual and legitimate manufacturing cost. If the volume contains matter to which a copyright could not properly extend, incorporated with matter proper to be covered by a copyright, the two necessarily going together when the volume is sold as a unit, and it being impossible to separate the profits on the one from the profits on the other, and the lawful matter being useless without the unlawful, it is the defendants who are responsible for having blended the lawful with the unlawful, and they must abide the mischief and the consequences, on the same principle that he who has wrongfully produced a confusion of goods must alone suffer. As was said by Lord Eldon, in Mawman v. Tegg, 2 Russell, 385, 391: 'If the parts which have been copied cannot be separated from those which are original, without destroying the use and value of the original matter, he who has made an improper use of that which did not belong to him must suffer the consequences of so doing. If a man mixes what belongs to him with what belongs to me, and the mixture be forbidden by the law, he must again separate them, and he must bear all the mischief and loss which the separation may occasion. If an individual chooses in any work to mix my literary matter with his own, he must be restrained from publishing the literary matter which belongs to me; and if the parts of the work cannot be separated, and if by that means the injunction which restrained the publication of my literary matter, prevents also the publication of his own literary matter, he has only himself to blame.' The present is one of those cases in which the value of the book depends on its completeness and integrity. It is sold as a book, not as the fragments of a book. In such a case, as the profits result from the sale of the book as a whole, the owner of the copyright will be entitled to recover the entire profits on the sale of the book if he elects that remedy. Elizabeth v. Pavement Co., 97 U. S. 126, 139 [24 L. Ed. 1000]."

See, also, Belford v. Scribner, 144 U. S. 508, 12 Sup. Ct. 734, 36 L. Ed. 514.

In the present case it is impossible to separate that which is taken from the story from the remainder of the play and we can reach no other conclusion than that the complainant is entitled to recover the whole profits from the play.

For these reasons, the decree of the Circuit Court is affirmed, with costs.

WARD, Circuit Judge. I am not able to concur in the opinion of the court in this case. Two accounts are given of the original complainant's dealings with respect to the story called "The Transmogrification of Dan" with the Ess Ess Company. Dam himself verified the original bill in which he averred that he gave that company merely the right to publish the story in the number of its magazine for September, 1901, and that it was to take out a copyright in trust for him as to every other right. He followed this by an affidavit made in the cause to the same effect. All this time he had in his possession an assignment from the Ess Ess Company of its copyright. This is the first account. After Dam's death the bill was amended by stating that he sold the story to the Ess Ess Company with the right to copyright the same, whereby it obtained the exclusive privilege of "printing, reprinting, vending, dramatizing and translating" the same, and that the Ess Ess Company subsequently assigned its copyright to him, so far as it covered the story. This is the second account.

These two accounts are entirely inconsistent and lead to very different results. If the second, made after Dam's death, be adopted, the conclusion of the majority of the court is clearly right because the law provides for but one copyright, and, as I think, that the right of translation and dramatization is covered by it as an incident of the ownership of the copyrighted work. On the other hand, if the account given by Dam himself is adopted, no right except to publish the story in the magazine was secured. Certainly under the case of Mifflin v. White, 190 U. S. 260, 23 Sup. Ct. 769, 47 L. Ed. 1040, the notice of the entry of the magazine in the name of the Ess Ess Company was not notice to the public of Dam's reserved rights in the story if he had any, and they were capable of protection. The form of certificate provided by section 4957, Rev. St. U. S. contains no provision for ownership of the right to dramatize or translate separate from ownership of the copyrighted work. The person getting the copyright is described as claiming "as author (originator, or proprietor, as the case may be)," and section 4964 permits the dramatization or translation of a copyrighted work with the consent of the proprietor. Congress could not have intended that the assignee of the author, not being actually the proprietor, should authorize the translation or dramatization of the work; such rights belonging to some one else. The experienced attorney for the complainant undoubtedly amended his bill because he saw that there could be no recovery under it as originally drawn. The majority of the court take the same view, but hold that the only possible conclusion to be drawn from what was done by the parties is that the Ess Ess Company in the face of Dam's verified statements to the contrary, became the absolute proprietor of the work.

I think, however, that sending a story to a periodical and receiving back a check for the same is as consistent with selling the story for publication in the periodical only as it is with selling it outright. If to this be added a receipt for the check as payment in full for the story, the case is not advanced. A receipt is always open to explanation. 17 Cyc. 629. If a contest as to title had arisen between Dam and the Ess Ess Company and he had been plaintiff, he would have been permitted to show, if he could, that the sale was not absolute but with reservations, and for this purpose he could have availed himself of any act or declaration of the Ess Ess Company inconsistent with an absolute sale. Similarly, if the Ess Ess Company had been plaintiff, it would have been permitted to use any declarations of Dam, if he had made any, to the effect that the contract was an absolute sale as an admission of that fact. And, treating the receipt as a contract, a stranger to the transaction like the defendant would be allowed to contradict it by parol testimony. McMaster v. Insurance Co., 55 N. Y. 222, 234, 14 Am. Rep. 239; Condit v. Cowbrey, 123 N. Y. 463, 25 N. E. 946.

Adopting the account given by Dam himself of the transaction, which by the way is consistent with the gratuitous assignment to him by the Ess Ess Company of its copyright, I think the bill should be dismissed.

## On Petition for Modification of Order for Mandate.

PER CURIAM. Upon the denial of the petition for a rehearing this court directed that the mandate should contain a provision that the affirmance of the decree of the Circuit Court should be without prejudice to the right of that court to amend its decree so as to provide for the recovery of damages if the court should be satisfied that there is a lawful and practicable method of ascertaining substantial damages sustained by the complainant, and that for such reason the decree is too broad. The complainant now insists that such a modification should not be permitted, contending that the Circuit Court has no power to award damages in copyright suits in equity. The complainant in her complaint asks for damages as well as profits, and it may be that the equity powers of the Circuit Court are broad enough to award them. But it is unnecessary to decide this question, for there is a difficulty which arises in view of the complainant's present position. The decree awards profits, and the complainant expressly disclaims any desire to recover damages. We know of no principle upon which a court of equity can compel a complainant to take damages, instead of profits, when he insists upon the latter.

The order for the mandate will provide simply for the affirmance of the decree, with costs.