Ray BRADBURY, Appellant,

v.

COLUMBIA BROADCASTING SYSTEM, INC., a corporation; Martin Manulis; and Robert Alan Aurthur, Appellees.

No. 16626.

United States Court of Appeals
Ninth Circuit.

Jan. 20, 1961.

Rehearing Denied March 22, 1961.

Sanford I. Carter, Gerson Marks, Beverly Hills, Cal., for appellant.

Lillick, Geary, McHose, Roethke & Myers, William A. C. Roethke, Anthony Liebig, Los Angeles, Cal., for appellees.

Before BARNES and HAMLEY, Circuit Judges, and FOLEY, District Judge.

FOLEY, District Judge.

Ray Bradbury, owner of the copyrights in his literary works, The Fireman and Fahrenheit 451, brought this action for infringement, seeking damages and injunctive relief. He appeals from the judgment denying the relief prayed for in his complaint.

The alleged infringing work is a television production entitled A Sound Of Different Drummers televised by Columbia Broadcasting System on October 3, 1957. Columbia together with Robert Alan Aurthur, who wrote the television script, and Martin Manulis, who produced it, were named defendants.

The appellant will be hereinafter referred to as plaintiff and appellees as defendants.

Bradbury appeals, specifying as error the findings and conclusions that the script entitled A Sound Of Different Drummers was original; that Aurthur did not have access to Bradbury's copyrighted works prior to the telecast; that Aurthur did not copy from Bradbury's works; and that there is no similarity in the literary expression.

At the outset of his opinion, 174 F. Supp. 733, 734, the trial Judge stated:

"It is Bradbury's claim that the play lifted, in whole or part, materials from two of his books duly copyrighted, 'The Fireman' published in 'Galaxy', a Science Fiction magazine, in February, 1951, and later expanded into a copyrighted book called 'Fahrenheit 451', published in 1953. In both instances, the Copyright Act was fully complied with (17 U.S.C.A. §§ 1–22) and the copyrights are now owned by Bradbury.

"We state at the outset that the attorneys for the defendant agree with the court and concede that the material was copyrightable and fulfilled the legal requirements of originality. The problems to resolve are access and infringement."

Access.

Both plaintiff and defendants agree that in the copyright field access means not merely the opportunity to have read or known the contents of a work, it means actual reading or knowledge thereof. Harold Lloyd Corporation v. Witwer, 9 Cir., 65 F.2d 1, 16.

From the evidence it is apparent that the defendants, Columbia and Aurthur, had knowledge of plaintiff's copyrighted works prior to the writing or telecast of A Sound Of Different Drummers. Bradbury testified that in 1952 he entered into a written agreement with Columbia with respect to the television rights to The Fireman and Exhibit 3 was identified and received as an executed copy of said written contract. This testimony is not contradicted and an inference therefrom cannot be avoided that as early as 1952 defendant Columbia had actual knowledge of the contents of plaintiff's works.

Defendant Aurthur testified that he had been a free-lance writer since 1947 and was employed during the spring of 1955 at the National Broadcasting Company as associate producer of the Philco Television Playhouse, and that his duties were mainly in the area of working with writers in terms of developing scripts under the supervision of Gordon Duff, producer, and that his relation with Duff was of five or six years' duration. Aurthur testified that he gave first consideration to the plaintiff's work, Fahrenheit 451, when a Mr. Wolfe came into his office in early April of 1955. Wolfe told him that he thought there was material in the book, Fahrenheit 451, that perhaps television was prepared to accept.

After some discussion, Aurthur and Wolfe interviewed Gordon Duff and Aurthur explained to Duff what Wolfe "wanted to do," to which Duff replied, "Well, let me read the book." It is apparent that the book referred to in the discussion was Fahrenheit 451.

Following this discussion and under date of April 22, 1955, Aurthur addressed a letter to Don Congdon, Bradbury's agent. After dispatching this letter to Congdon, Bradbury had telephone conversations with Congdon relative to television rights to Fahrenheit 451. Aurthur testified that Duff had decided to produce for television Fahrenheit 451.

Bearing on this question of whether Aurthur had read or had knowledge of plaintiff's works, he testified as follows:

"Q. Well, had you discussed with Mr. Duff the matter of producing Fahrenheit 451 on the program on which you and Mr. Duff were partners? A. Yes. There was one discussion.

"Q. Did you know anything about the story of 451? A. I knew about the book burning of the future, yes, sir.

"Q. Who told you that? A. Bernie Wolfe.

"Q. Had you read any reviews or synopses of 451? A. No, sir.

"Q. Well, what did Wolfe tell you about the story of 451? Tell us what Wolfe told you? A. That it was a book about book burning in the future. You see, we had never discussed the story. We discussed his desire to do a show. The discussion of the story never came about, because it was never a point at which I came in contact with Wolfe in relation to the story.

"The Court: But the subject matter of the story was discussed because you just said—

"The Witness: Yes, sir.

"The Court: Something about book burning.

"The Witness: Yes, sir.

"The Court: All right.

"Q. By Mr. Marks: And in no greater detail? A. No, sir.

"Q. Now, in May of 1955, did you and Duff inform Wolfe that you could get the TV rights to the Fahrenheit book, if he wanted it?

A. I am not sure whether we did, or whether he heard personally from Don Congdon, because he was also Congdon's client.

"Q. And in May of 1955, did you tell Wolfe that you and Duff were very much interested in putting on Fahrenheit 451? A. The subject involved Gordon Duff's doubts that we had enough money, or enough facilities to do a science fiction story.

"Q. By Mr. Marks: At the meeting that I just described with members of the technical staff, Mr. Aurthur, do you remember that you and Mr. Duff at that time indicated that Fahrenheit 451 might make an excellent opening program for the fall series, which you were then contemplating? A. Mr. Duff made the decision to enter into negotiations for Fahrenheit 451. And I acted as agent in this case on the phone calls. I don't recall the exact statement you called. There may have been such talk, there may have been a statement relating to the fact that 1984 the previous fall had been Studio One's opening show. That might have been what that discussion was about.

"Q. * * * Did you suggest to Mr. Wolfe that he prepare an outline setting forth the various technical problems involved in the television adaptation of Fahrenheit 451? A. No, sir, Mr. Duff recounted that.

"Q. I would like to have this outline marked at this time for identification.

"The Court: It may be marked for identification.

"The Clerk: Plaintiff's Exhibit No. 17 marked for identification.

* * * * * *

"Q. By Mr. Marks: Well, let's get back to the conference with Mr. Wolfe, Mr. Duff and these technical assistants of yours, and yourself, Mr. Aurthur, for a moment.

"I have handed you what has been marked for identification as Plaintiff's Exhibit 17, which appears to me, I believe, to be an outline of the technical problems I mentioned before. A. Yes, sir.

"Q. And I ask you, is that a copy of the outline that was made by Wolfe, pursuant to the results of this conference with yourself and Duff, and these other technical assistants? A. I don't know. I would imagine so, yes, sir. But specifically, I don't know.

"Q. Well, does it appear to you that it— A. It would appear to be what it says it is, yes, sir.

"Mr. Marks: All right. May I offer that in evidence.

"The Court: It may be received.

\*    \*    \*    \*    \*    \*

"Q. By Mr. Marks: Now, I believe that in connection with your interrogatories, Mr. Aurthur, you indicated that the story of Fahrenheit 451 had been told to you, as I recall, in general terms. A. Yes sir.

"Q. And would you tell us what you mean by 'in general terms'? A. Would you mind reading exactly what I said, so I will know exactly what I said?

"Q. Yes, indeed. A. Because I don't know if I used the word 'total' or not.

"Q. \*  \*  \* I will read the interrogatory and the answer. The interrogatory is: 'Did anyone ever tell you the story of plaintiff's works or describe plaintiff's said works to you?' A. Yes, sir.

"Q. And your reply is: 'No, but Bernard Wolfe had told me about Fahrenheit 451 in general terms.' A. Yes, sir.

"Q. And now, I say what were those general terms that you speak of, please?

[Then an exchange of remarks by the Court with the witness.]

"Q. By Mr. Marks: In other words, you have already testified as much as you are able to testify with respect to how much of this story was related to you? A. Yes, sir.

"Q. And no more? A. That's right, yes, sir.

"Q. Now, over all the period that these negotiations were going on, and that these conferences with respect to technical problems were going on, you never read the book? A. No, sir.

"Q. You never read the book? A. No, sir.

"Q. Or any reviews or synopses of it? A. No, sir.

"Q. Yet you were considering putting this on a top line program? A. Mr. Marks, I have already explained that my only concern was of the television play. I was in rehearsal with my own show. I was considering perhaps ten or twelve other shows at the same time.

"Q. Well, did you consider that you had any responsibility for reading this property? A. No, sir. Mr. Duff read the property.

"Q. Well, did you discuss it with Mr. Duff? A. No, sir.

"Q. Never? A. No, sir.

"Q. And he was your partner? A. Yes sir, he was the boss."

If Aurthur is to be understood as having testified that he had not read or had knowledge of The Fireman or Fahrenheit 451 prior to the production of the teleplay, such testimony, when considered with similarities between Fahrenheit 451 and the teleplay, is unworthy of belief. Here we have not only direct evidence of access but we find similarities from which access and copying may be inferred.

The evidence of access by the defendant Aurthur to plaintiff's works, considered with noteworthy similarities in defendants' production, A Sound Of Different Drummers, is strong and persuasive evidence of copying which requires the defendants to counter with

strong convincing and persuasive evidence to the contrary. Overman v. Loesser, 9 Cir., 205 F.2d 521, 523. Defendants have not countered the effect of the evidence of access and similarities with strong convincing and persuasive evidence. They have merely denied copying.

Similarities, Copying and Infringement.

After testifying that he had viewed the film of A Sound Of Different Drummers, Bradbury narrated, on direct examination, twenty-two claimed similarities, as follows:

1. "The bookburners are called 'Firemen' in plaintiff's works and are called 'Bookmen' in defendants' production. They are both regimented government employees whose function is to go out and burn and destroy books.

2. "The opening scene in The Fireman is one in the firehouse with an alarm turned in and the Firemen rushing off in response. At the scene of the alarm, they confront an old woman, ask for her books, find them and, when she refuses to leave her kerosene-filled house, prepare to kill her; whereupon, she strikes a match and explodes the house and herself.

"In defendants' teleplay the story opens at the residence of the two Bookmen who are summoned by an alarm to investigate some readers. The Bookmen rush in to an apartment house, find an old man and an old woman, ask for the books, find the books and destroy the old man and the old woman on the spot.

"Both in the teleplay and The Fireman reference is made to having burned an old man's place the night before.

3. "In the third scene of defendants' teleplay, the Bookman, returning to headquarters, meets the 'different' or 'unorthodox' girl who provokes him into new ways of thinking about life and his work by her unorthodox approach.

"In plaintiff's work Fahrenheit 451, the Fireman meets a 'different' girl, one with unorthodox ideas, outside his house on return from a burning job.

"In each, the 'different' girl influences and motivates the leading character and the development of the plot.

4. "In plaintiff's works the Fireman, the leading character, steals a book behind the backs of other Firemen.

"In defendants' teleplay, the 'girl' steals a book behind the backs of Bookmen and then influences the leading character to read the illegal book.

5. "In plaintiff's works, the Fireman comes home to find his wife sodden with narcotics and a thimble-sized radio tamped in her ear.

"In defendants' teleplay the Bookman comes home to find his roommate, sodden with narcotics, a thimble-sized radio tamped in his ear.

6. "In plaintiff's works the 'unorthodox' girl asks the Fireman whether he ever read any of the books he burns, and the reply is that it is against the law.

"A similar question and a similar reply is made in defendants' production.

7. "In Fahrenheit 451, the Fireman has trouble talking to his wife, because she is constantly watching various diversions on the wall-to-wall television.

"Similarly, in defendants' production, the Bookman has trouble talking to his roommate because he is constantly watching various sporting activities on the wall-to-wall television.

8. "In plaintiff's works a definite point is made about the lack of pedestrians, and that 'taking a walk' is almost subversive.

"In defendants' production this subject is also discussed.

9. "In plaintiff's works the 'unorthodox' girl is fascinated by nature and the outdoors and tells the Fireman that she loves the rain, et cetera.

"Similarly in defendants' teleplay the 'unorthodox' girl takes the Bookman out of the city and into nature and speaks in similar terms about their life and this world beyond society and they are even caught in the rain, and the reactions to rain are the same.

10. "In plaintiff's works the Fireman reveals to his wife that he has been stealing books to read.

"In defendants' production the 'unorthodox' girl reveals that she has stolen books to read.

"This episode, both in plaintiff's works and in defendants' production, ends the same way, with the Fireman or Bookman reading the forbidden book.

11. "In Fahrenheit 451, one of the first books shown by the Fireman to his wife is The Holy Bible. In defendants' production, the first book shown the Bookman by the 'unorthodox' girl is The Holy Bible.

12. "The opening of Part Two, Fahrenheit 451 and the opening of the Third Act of defendants' production are substantially the same.

"In one, the Fireman reads to his wife from the forbidden books, and in the other the Bookman reads to the 'unorthodox' girl from forbidden books; and it appears that the reading has gone on for some time.

13. "In plaintiff's works, the Fireman goes to an old man to get him to help organize classes in thinking and reading, and to find some way to preserve books. They agree to find a way to print books and organize some underground group of readers.

"In defendants' production, the 'unorthodox' girl leads the Bookman to an underground group that already exists, dedicated to reading and preserving the books.

"In both plaintiff's works and defendants' production members of the underground group memorize and quote from portions of great books.

14. "In plaintiff's works, the Fireman rather than go out on another raid reports himself sick.

"In defendants' production, similarly, the Bookman rather than go out on another raid reports himself sick.

15. "In Fahrenheit 451, the Fireman is lectured by a superior about books and society and is told that the superior has read a few books and they say nothing.

"Similarly, in defendants' production, the Bookman's superior admits to having read a few books and says that there is nothing to them.

16. "In Fahrenheit 451, the old man refers to the solid, unmoving majority as the most dangerous enemy to truth and freedom.

"In defendants' teleplay there is a similar reference to the 'compact majority' and their danger to mankind.

17. "In Fahrenheit 451, the Fireman's superior explains the adverse effect of some families upon children and that the home environment can undo a lot they try to do at school.

"Similarly, in defendants' script, emphasis is against the family, and there is reference to the effect that families are dangerous and can ruin children.

18. "In Fahrenheit 451, the Fireman, in ignorance of where he is going, is taken to burn his own house.

"In defendants' teleplay, the Bookman, in ignorance of where he is going, is taken to kill his own friends.

19. "In Fahrenheit 451, the Fireman, after the murder of the Fire-

chief, flees with his books and escapes.

"In defendants' production, the Bookman starts to flee with his books and the 'unorthodox' girl, is knocked down and captured.

20. "Both in plaintiff's works and defendants' production, we see the organized underground consisting of Readers and Memorizers.

21. "The relationship between various characters is very similar both in plaintiff's works and in defendants' production, as, for example, the relationship between the Fireman and his superior on the one hand, and the Bookman and his superior on the other.

22. "In both the plaintiff's works and defendants' production, the intimacy of personal relationship is used for the same purpose. For example, in the plaintiff's works it is the hero's wife who informs on him to the authorities. In the defendants' production it is the hero's roommate who informs on him to the authorities."

No contention is made by defendants that the above recited similarities do not exist and it is apparent that an ordinary person or observer, after reading The Fireman, Fahrenheit 451, and seeing the picture A Sound of Different Drummers, would note similarities as we did which would bring about a belief that A Sound Of Different Drummers is a dramatization or adaptation of Fahrenheit 451.

The incidents and their sequence that make up the action and develop the story in each of the works are too similar to be coincidental.

The similarities here, like those dealt with by Judge Knox in Simonton v. Gordon, D.C.S.D.N.Y., 12 F.2d 116, 123, could not have occurred without access to plaintiff's works. It is inexplicable that without access to the plaintiff's book that Aurthur would have incorporated into his play such a number of similar and parallel incidents, episodes and scenes. As in the Simonton case,

the difference existing between the novel and the play are no more than Aurthur believed necessary in order to adapt plaintiff's story to the limitations of the television screen.

We must keep in mind, in addition to the similarities, that we have uncontroverted testimony in this record of Aurthur's interest in plaintiff's works, of his activities looking to a television adaptation, and the fact of Columbia's option to take Bradbury's novel. All this, when considered with the similarities, meets head-on and overwhelms the denial of Aurthur that he had read or knew of the contents of plaintiff's works before the television production.

In Dam v. Kirk La Shelle Co., 2 Cir., 175 F. 902, 907, 41 L.R.A.,N.S., 1002, in dealing with a situation such as we have here, the Court said:

"It is impossible to make a play out of a story—to represent a narrative by dialogue and action—without making changes, and a playwright who appropriates the theme of another's story cannot, in our opinion, escape the charge of infringement by adding to or slightly varying his incidents.

"It is undoubtedly true, as claimed by the defendant, that an author cannot by a suggestion obtain exclusive control of a field of thought upon a particular subject. If the playwright in this case without the use of the story, and working independently, had constructed a play embracing its central idea, it may well be that he would not have infringed the copyright of the story. But a comparison of the play with the story shows conclusively in many unimportant details that Armstrong read the story and used it as the basis of his play. It is practically impossible that the similarities were coincidences. Other testimony is to the same effect. In our opinion the playwright deliberately appropriated the story and dramatized it. THE STATUTE GIVING AUTHORS OF COPYRIGHTED WORKS THE EX-

CLUSIVE RIGHT TO DRAMATIZE THEM MUST RECEIVE A REASONABLY LIBERAL APPLICATION OR IT WILL BE WHOLLY INEFFECTIVE. [Emphasis ours.] As we have just pointed out, the adaptation of a story to the stage must necessitate changes and additions. Few short stories could be transformed into dramatic compositions without the addition of many new incidents. Unless the copyright statute is broad enough to cover any adaptation which contains the plot or theme of the story, it is wholly ineffective. If Armstrong by what he did, did not infringe the dramatic rights of this story, it is difficult to see what he could have done which would have infringed them."

A comparison of Bradbury's story with the play shows in many important and unimportant details as well that Aurthur actually read the story or had knowledge thereof before and during the writing and production of the teleplay.

An ordinary person, after reading plaintiff's works and viewing the teleplay, might well believe that Aurthur had copied plaintiff's works. The similarities which here exist are novel in Bradbury's story; they are strange and unusual. Defendants not only copied the theme and ideas of Bradbury's copyrighted work but also its expression. The copyright of a story covers what is new and novel in it. There are similarities existing between plaintiff's copyrighted works and defendant Aurthur's play, which upon an analysis, would be found to be novel in the story and of such a nature as to be within the protection of the copyright statutes. Harold Lloyd Corporation v. Witwer, 9 Cir., 65 F.2d 1, 18, 23.

Many of the incidents, sequence of events, development and interplay of the characters are the same.

■ Fair use may permit copying of theme or ideas of copyrighted work but not its expression. Sheldon v. Metro-Goldwyn Pictures Corporation, 2 Cir., 81 F.2d 49, 54.

■ To constitute an invasion of copyright it is not necessary that the whole of a work should be copied, nor even a large portion of it in form or substance, but that, if so much is taken that the value of the original is sensibly diminished, or the labors of the original author are substantially, to an injurious extent, appropriated by another, that is sufficient to constitute an infringement. The test of infringement is whether the work is recognizable by an ordinary observer as having been taken from the copyrighted source. Slight differences and variations will not serve as a defense. The means of expressing an idea is subject to copyright protection and where one uses his own method or way of expressing his idea, as Bradbury has done, such adornment constitutes a protectible work. Universal Pictures Co. v. Harold Lloyd Corporation, 9 Cir., 162 F.2d 354, 361, 363.

■ It is not established by the evidence that Martin Manulis participated in the writing of the script of Aurthur's teleplay nor did he have access to either The Fireman or Fahrenheit 451 prior to the broadcast. There is no evidence tending to show that he had knowledge of the plaintiff's works. He testified that prior to rehearsal, in response to a telephone query from someone at an executive level at Columbia, that he postponed operations awaiting advice from the broadcasting company's legal department on this question of similarity, and was advised to go ahead with the show by a member of the company's legal department. No liability on his part is disclosed in the record.

■ Columbia, in October 1957, broadcast A Sound Of Different Drummers over its facilities on its production Playhouse 90. Being chargeable with notice and knowledge of the facts known to the defendant Robert Alan Aurthur, it is liable to plaintiff for infringement of his copyrighted works. Universal

Pictures Co. v. Harold Lloyd Corporation, 9 Cir., 162 F.2d 354, 371.

Defendants Columbia Broadcasting System, Inc. and Robert Alan Aurthur, in producing A Sound Of Different Drummers, did knowingly and wilfully copy from protectible material contained in plaintiff's copyrighted works and did so without his knowledge or consent.

The Court's findings that the teleplay, A Sound Of Different Drummers, was original; that Robert Alan Aurthur did not have access to either The Fireman or Fahrenheit 451 prior to said broadcast; that defendant Robert Alan Aurthur did not copy either The Fireman or Fahrenheit 451; and that there is no similarity in the literary expression between plaintiff's said works and the teleplay A Sound Of Different Drummers, are, and each of them is, clearly erroneous.

The judgment is reversed as to defendants Columbia Broadcasting System, Inc. and Robert Alan Aurthur; and affirmed as to Martin Manulis; and the action is remanded to the trial court with directions to determine the issue of damages and to enter judgment as prayed for in plaintiff's complaint in favor of the plaintiff and against the defendants, Columbia Broadcasting System, Inc. and Robert Alan Aurthur, with costs including reasonable attorneys' fees.

BARNES, Circuit Judge (dissenting).

I dissent.

My colleagues first substitute their conclusion for that of the trial judge as to which witnesses are or are not worthy of belief, and secondly, it appears to me they bolster their conclusion by uncritically parroting the appellant's position that there exist twenty-two alleged similarities from which, my colleagues say, this court *must infer* both access and copying.

I have believed a trial judge who personally has had the opportunity to observe the conduct and demeanor of the various witnesses was in a better position than an appellate judge to determine who was telling the truth. This Circuit has gone a long way to preserve the integrity of this principle. Ly Shew v. Dulles, 9 Cir., 1954, 219 F.2d 413, 416, and cases cited in note 12; Mar Gong v. Brownell, 9 Cir., 1954, 209 F.2d 448, 449; N.L.R.B. v. Howell Chevrolet Co., 9 Cir., 1953, 204 F.2d 79, 86, affirmed 346 U.S. 482, 74 S. Ct. 214, 98 L.Ed. 215.

The majority say that "a comparison of Bradbury's story with the play shows in many important and unimportant details as well that Aurthur actually read the story or had knowledge thereof before and during the writing and production of the teleplay." If this were recited in an affidavit, I suspect my colleagues would say it was purely conclusionary— that no facts had been stated. And in the majority opinion none of these "important and unimportant details" are specifically pointed out.

The majority state that: "An ordinary person, after reading plaintiff's works and viewing the teleplay, might well believe that Aurthur had copied plaintiff's works." This ordinary judge did not, nor did the able trial judge below. The latter is no stranger to this segment of the law, holding an acknowledged national reputation as an authority on plagiarism.

Having come to a factual conclusion directly contrary to the trier of facts below, and without any considered analysis of those facts, the majority here cite as authority five cases: Dam v. Kirk La Shelle Co., 2 Cir., 1910, 175 F. 902, 907, 41 L.R.A.,N.S., 1002; Simonton v. Gordon, D.C.S.D.N.Y.1925, 12 F.2d 116; Harold Lloyd Corporation v. Witwer, 9 Cir., 1933, 65 F.2d 1, 18, 23; Sheldon v. Metro Goldwyn Pictures Corp., 2 Cir., 1936, 81 F.2d 49, 54; Universal Pictures Co. v. Harold Lloyd Corp., 9 Cir., 1947, 162 F.2d 354, 361, 363. These cases all represent good law, but do not require a reversal here, on the facts as I see them.

In Dam v. Kirk La Shelle Co., supra, the court was not (as the majority opinion correctly states) "dealing with a situation such as we have here." In Dam,

the court thought it "unnecessary to review the evidence in detail with respect to the question of infringement. The Circuit Court has carefully compared the story with the play, and we agree with its [the district court's] conclusion that the play is a dramatization of the story. * * * [T]he theme of the story is the theme of the play * * *." [175 F. 907]. Thus, in Dam the appellate court was agreeing with the trial court there had been infringement.

In Simonton v. Gordon, supra, a district court case, an able judge (Judge Knox) goes into an extremely detailed factual analysis of "White Cargo," alleged to have been taken from "Hell's Playground." He quotes incidents, scenes, and episodes, even similarities of language, and "paraphrases." After the careful seven page analysis (out of the eight pages of the opinion), Judge Knox opines: "The foregoing list of similarities might be extended indefinitely." [12 F.2d 123]. This case to me constitutes no authority for the action taken by the majority herein.

Similarly, the forty-eight page opinion in Harold Lloyd Corporation v. Witwer, supra, carefully analyzes and compares the similarities in theme, incident, scene and episodes. It *affirms* the judgment of infringement ordered below.

In Sheldon v. Metro Goldwyn Pictures Corp., supra, Judge Learned Hand did reverse a judgment on nonplagiarism below, but only after spending six of the six and one-half pages in the opinion in a careful listing of the many similarities between "Letty Lynton," "Dishonored Lady," and the story, in the public domain, of Madeleine Smith.

In Universal Pictures Co. v. Harold Lloyd Corp., supra, again, the court below awarded damages for plagiarism, and this court noting the "advantages" that trial court had in having the witnesses before it, affirmed.

Thus, in but one of the five cases cited in the majority opinion (Sheldon v. Metro Goldwyn Pictures Corp., supra) has an appellate court reversed the factual determination made below. And that, by an analysis that is comparable, not to the majority decision herein, but to the detailed analysis made in the trial court.

But desiring to avoid the error I believe my colleagues make, I desire to point out some of the reasons why I cannot "buy" the appellant's alleged similarities.

It seems to me that the fundamental thesis of protest against a heavily organized society, and its thought-controlling government, is as old as literature. Ideas are not subject to copyright, but manners of expression are. I have examined the twenty-two "similarities" urged by appellant. I do not find similarity of expression, as distinguished from similarity in basic ideas, in any more than two of the suggested twenty-two similarities. For example, in item 1, the bookburners are called "firemen" in appellant's work; "bookmen" in appellee's production. This is a *difference* in detail and in manner of expression, not a similarity in expression. The destruction of books, the destruction of learning, the destruction of written knowledge, is but a reference to history, whether it be to the Middle Ages or to Hitler's Germany. In item 3, meeting the "different" or "unorthodox" girl is not a similarity in incident or sequence of events, or in development or interplay in the characters. The basic idea of an unorthodox female character is again as old as literature, and having that girl motivate or influence leading characters in the development of the plot is no more than the love interest essential to most all, if not all, plays or motion pictures. Further, she is an evanescent and immaterial character in the book, but not in the television play. With respect to item 4, stealing behind someone's back is not new. Stealing has to be behind the back of somebody, unless the culprit wishes to invite capture. Stealing a book is certainly not new in any story dealing with books, and the influence of the girl on the leading character to read the illegal book did not constitute a difference in events and sequence. Many other incidents seem to

me to be merely fortuitous circumstance. I admit that item 2, where an alarm opens the scene, well might be considered a "similar incident," but from there on the incidents change completely; the characters are different; the results are different—one being a murder and the other suicide. One might say that in item 7, the inability to communicate with the wife in the one case, and with the roommate in the other, having developed from the interest of each in wall-to-wall television, is a similar incident. But from my limited reading, this has been commented upon before and is part of "1984", among other works. Item 11 (that among books shown is the Holy Bible), seems to me not unusual. It would be difficult to dramatically discuss the burning of all books without making a reference to the Great Book. Item 13 shows *differences*, not similarities. In item 12, as I remember the facts, there is still another difference. The fireman reads to his wife who was an uninspired and unsympathetic listener; the book-man reads to the girl who is an inspired and sympathetic listener. The setting of the leading man reading to a companion is the same, and that *is* a similarity, but there it ends. The sequence is different. I could go on—for example, similarities numbers 21 and 22, cited by the majority, mean nothing to me.

In summary, I believe the majority opinion adopts the appellant's argument hook, line and sinker, in the twenty-two similarities urged by appellant and in the long summary of characters, sequence and incidents. I do not feel that the labored "dissection" made by appellant's counsel (with such catch-phrases as "in-verse fireman," etc.) can supersede a viewer's general over-all impression. As I understand it, it is the over-all impression to the viewer that controls, as we said the test is in this circuit in Harold Lloyd Corporation v. Witwer, supra, 65 F.2d at page 28. I think that the emphasis in Bradbury's work was on science and fiction (and specifically upon a mechanical hound with a hypodermic needle in its snout). In "A Sound of Different Drummers" the emphasis was upon the individuals' moral and intellectual revolt against a subjugated society. The opinion below details the fundamental differences in the two works. 174 F.Supp. 733 (1959).

To repeat, I do not think we grant any trial judge the full measure of his authority as a trier of fact on the issue of similarities when we rule as a matter of law he was in error, where there exists no real similarity of scenes and episodes, no startling examples of peculiarly phrased sentences, no paraphrase of text. To say that the trial judge erred when weighing what he found, against the expressed denial of Aurthur (that he had read and knew of the contents of appellant's work), seems to me to be an unjustified derogation of the trial court's rights. I find no such great number of similarities to indicate to me that it would be impossible for the limited number of admitted similarities to have been coincidental.

Therefore, while not necessarily adopting all of Judge Yankwich's opinion, I would be content to rely upon it generally, and certainly would affirm the judgment below.